THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ALBERT HOGAN, Defendant-Appellant.

First District (3rd Division)   No. 1—07—1250

Opinion filed March 11, 2009.

Michael J. Pelletier, Patricia Unsinn, and Jennifer L. Bontrager, all of State Appellate Defender's Office, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (James E. Fitzgerald, Samuel Shim, and Cristin Duffy, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE MURPHY delivered the opinion of the court:

After a jury trial, defendant, Albert Hogan, was found guilty of aggravated kidnapping and aggravated criminal sexual assault and sentenced to 23 years' imprisonment. On appeal, defendant contends that (1) the State did not prove him guilty beyond a reasonable doubt; (2) the trial court erred when it gave the jury transcripts of the victim's testimony but not defendant's, even though the jury requested both; (3) the trial court failed to properly instruct the jury; and (4) the trial court improperly deferred ruling on his motion *in limine* seeking to bar the State from introducing evidence of his prior residential burglary conviction against him at trial. Because we agree that the trial court improperly deferred ruling on defendant's motion *in limine*, we reverse defendant's convictions and remand for a new trial.

## I. BACKGROUND

Defendant was charged in a 19-count indictment with aggravated kidnapping, armed robbery, aggravated criminal sexual assault, attempted first-degree murder, and aggravated battery based on his alleged assault of B.W. The prosecution proceeded at trial with counts I and II (aggravated kidnapping), IX and XI (aggravated criminal sexual assault based on vaginal contact), and XII and XIV (aggravated criminal sexual assault based on anal contact).

B.W. testified that on June 21, 2001, at about 4:30 a.m., she left her boyfriend, Rickie Campbell's house for work. She was wearing shorts and thongs, and she had $40 on her. She testified that she and her boyfriend had sexual intercourse the night before.

She tried to catch the bus at Austin and Chicago Avenue, but a bus was not there, so she walked four blocks from Austin to Central. Seeing no bus there, either, she proceeded to walk east on Chicago.

As she crossed an alley, defendant came up behind her, grabbing her neck and hair, and said, "Bitch, don't scream. I'll hurt you." Defendant told her that he had a gun, and although she did not see a gun, she felt a hard object pressed into her side. Defendant dragged B.W. down the alley and into a wooded area, where he struck her in the face, breasts, and arms with an object. Her nose began to bleed, and she was pushed to the ground, face down. He again told her,

"Bitch, don't scream. I'll hurt you." As she lay on the ground face down, defendant removed her shorts and "inserted his penis inside of me," although she did not know where he penetrated her, since she blacked out.

When B.W. regained consciousness, she was bloody and her clothes were all over the place. She gathered her clothes, wiped her face with her shirt, and made her way to the street. She walked to a police station, where she reported that she believed she had been raped. She told the police that her attacker's teeth "weren't normal"; there were "several rows of them" and they "stuck out." She then went to the hospital. When she got to the hospital, she no longer had the $40 that was in her pocket when she left the house that morning.

She was too traumatized to view a lineup the day of the rape. In November 2001, B.W. viewed a lineup wherein the police requested that the participants smile. She identified defendant in that lineup.

B.W. admitted during the State's direct examination that she was currently living in a residential mental-health facility; the week before, she was in St. Elizabeth's Hospital for detox; in March 2001, she was treated at the Madden Health Center for bipolar disorder, post-traumatic stress disorder, anxiety, and panic attacks; she had at least five felony convictions; and she used other names when she was arrested. Furthermore, she has also battled addictions to cocaine and heroin over the course of her life. She testified that she could not remember whether she was drunk or high at the time of the attack.

On cross-examination, B.W. testified that she was wearing denim shorts on the day of the attack because she was scheduled to do factory work. She clarified that she had a side view of defendant's face when he dragged her to the lot and had a clear view when he was in front of her. He continuously beat her, and she went unconscious when he was having sex with her. She did not "remember what entry it was" or "what part he inserted in." She testified, "When I got to the hospital, that's when they revealed it to me." She could not remember what she told the medical personnel at the hospital.

B.W. further testified on cross-examination that she had at least five felony convictions for retail theft, forgery, and possession of a controlled substance. When she was arrested for these offenses, she lied to the police about her name and, at times, about her date of birth. She further testified that she used heroin off and on, and she used crack cocaine "for a short period of time." She had not used crack cocaine since the age of 21.

In March 2001, she went to St. Mary's Hospital because she heard voices that were telling her to do things. She then checked herself into Madden; on April 27, 2001, B.W. received a weekend pass, and while

she did not return on April 30, she testified that she informed the doctors she might not return.

The parties stipulated that on March 5, 2001, B.W. went to St. Mary's Hospital complaining of voices telling her to kill herself. Her urine tested positive for opiates and cocaine. Because she continued to have major psychotic symptoms, she was transferred to Madden Mental Health for an inpatient evaluation. After the evaluation, B.W. agreed to be voluntarily admitted. She admitted smoking heroin since age 16 and smoking cocaine since age 21, and she reported periods of disorientation, difficulty focusing, illogical thinking, and delusions of invisibility. B.W. was described as exhibiting flight of ideas and loose association and having inappropriate affect, impaired judgment, and a lack of insight. She was diagnosed with substance abuse-induced mood disorder, depression, thought disorder with hallucinations, and heroin and cocaine use. B.W. went on a home pass from Madden on April 27, 2001, but did not return as scheduled on April 30, 2001.

Upon admission at Madden, B.W. was prescribed risperidone, an antipsychotic medication used for the treatment of schizophrenia and mania associated with bipolar disorder, and sertraline, which is used to treat depression, obsessive-compulsive disorder, panic disorder, post-traumatic stress disorder, premenstrual dysphoric disorder, and social anxiety disorder. B.W. testified that on June 21, 2001, she was on medications for the symptoms "that I have now."

Dr. Ricky Johnson, the emergency room physician who treated B.W. on June 21, 2001, testified that she reported having been forced into an isolated alley, punched repeatedly in the face, and sexually assaulted rectally and then vaginally. She could not remember whether she had lost consciousness. She had swelling between her eyebrows, across the bridge of her nose, and under her eyes; her two front teeth were loosened; and she had bruises around her neck. She was suffering from chemosis, swelling of the thin covering over the white part of the eye, due to blunt trauma, and her nose was fractured and bleeding. Johnson did not see any bruising or scratches on her arms, but he did see bruising on one of her legs. B.W. also had a rectal laceration that appeared to be fresh and an injury to the intergluteal area consistent with forcibly stretching apart the buttocks. Johnson did not find any vaginal trauma.

Johnson described B.W. as emotional and in a lot of pain. She never appeared to be illogical, and he did not order a toxicology screen because she showed no signs of being under the influence of drugs or alcohol. She was "alert and oriented times three"; her communication skills and eye contact were good, and she related her "story in a cogent and rather good fashion to me in good time."

Julia Scott, the nurse who assisted in the collection of evidence for the rape kit, testified that B.W. reported having participated in oral sex with defendant. Further, B.W. responded that she had not engaged in sexual activity within 72 hours of the assault.

Chicago police officer Jaromin testified that he was assigned to go to the police station to see the victim of a sexual assault. When he arrived, B.W. was crying and upset. She was able to give him pertinent information and told him that she was walking westbound when the assault occurred.

Defendant's and Rickie Campbell's DNA were found in B.W.'s vaginal swabs, and defendant's DNA was found in the rectal swab. Douglas Rudolfi, a forensic scientist employed by the Illinois State Police crime lab, testified that it is possible for semen originating in a woman's vagina to drain to the rectal area and for semen deposited in the rectum to drain into the vaginal area.

Rickie Campbell confirmed that he and B.W. had intercourse the night of June 20, 2001, and that she left at 4:30 a.m. on June 21. When she returned home from the hospital on June 21, she was frightened and shaken up.

Defendant testified that in the morning of June 21, 2001, he walked down Central to Chicago early looking for prostitutes. There were, in fact, prostitutes there, and B.W. approached him, offering to "trick off" with him for $10. They went through an alley and into a yard, where B.W. took all her clothes off and performed fellatio on him. She told him to "f--k me in the ass" and bent over. They proceeded to have anal sex. While they were doing so, however, she started looking around, which made him nervous. She put her arm around the lower part of his back to make him move faster and said, "He f--king me bitch." He ejaculated and left. When he left, B.W. was conscious. He denied carrying a gun, grabbing her from behind, or punching or choking her. He only had anal sex with B.W.

Defendant admitted that when he talked to Detective Collins, who was investigating the case, he denied knowing B.W. or having sex with her. Even when Collins told defendant that his semen had been found inside B.W., he still denied having sex with her. When the detective called an assistant State's Attorney, defendant continued to deny knowing B.W. or having seen her before. He did not tell the assistant State's Attorney that he had consensual sex with B.W. for which he paid her $10. He denied having sex with B.W. because he was embarrassed and did not want his wife to know that he had sex with a prostitute.

During deliberations, the jury asked whether it could have "transcripts." The judge noted that only B.W.'s testimony was avail-

able and, "very leery to give them only the victim's testimony without the defendant's," asked, with the agreement of counsel, which transcripts the jury wanted. The jury responded that it wanted transcripts of B.W.'s and defendant's testimony. In a separate note, the jury also asked for a transcript of Dr. Johnson's testimony. Because the court was awaiting the completion of the transcript of defendant's testimony, it sent back B.W.'s transcripts. It also sent back Johnson's testimony, although it is not clear whether it was sent back with B.W.'s.

Ten minutes after receiving B.W.'s transcript, the jury found defendant guilty of aggravated criminal sexual assault and aggravated kidnapping. The jury found that a gun was not used during the commission of the offenses. The trial court sentenced defendant to six years for the aggravated kidnapping, eight years for the aggravated criminal sexual assault based on vaginal contact, and nine years for the aggravated criminal sexual assault based on anal contact. The court ordered that the sentences run consecutively. This appeal followed.

## II. ANALYSIS

### A. Deferral of Ruling on Defendant's *Montgomery* Motion

Before trial, defendant filed a motion *in limine* to bar the State from introducing evidence of his 1997 residential burglary conviction against him at trial. The trial court ruled that the motion was premature. Defendant testified, and in rebuttal, the State admitted a certified copy of conviction. On appeal, defendant argues that the trial court committed reversible error when it deferred ruling on his motion *in limine*.

A trial court has discretion in granting a motion *in limine* and a reviewing court will not reverse a trial court's order allowing or excluding evidence unless that discretion was clearly abused. *People v. Owen*, 299 Ill. App. 3d 818, 823 (1998). "An abuse of discretion will be found only where the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court." *People v. Hall*, 195 Ill. 2d 1, 20 (2000).

"A defendant's right to testify at trial is a fundamental constitutional right, as is his or her right to choose not to testify." *People v. Madej*, 177 Ill. 2d 116, 145-46 (1997). The decision whether to testify ultimately rests with the defendant, but it is generally made after consultation with trial counsel. *People v. Medina*, 221 Ill. 2d 394, 403 (2006); *Madej*, 177 Ill. 2d at 146.

In *People v. Montgomery*, 47 Ill. 2d 510, 516 (1971), our supreme court cited Federal Rules of Evidence 609 in holding that a prior conviction may be used to impeach a witness when the following condi-

tions are met: (1) the prior conviction was punishable by death or imprisonment in excess of one year, or it involved dishonesty or a false statement; and (2) the date of conviction or release of the witness from confinement, whichever is later, is no more than 10 years before trial. The trial court must, in its discretion, determine that the probative value of the prior conviction outweighs the danger of unfair prejudice. *Montgomery*, 47 Ill. 2d at 517. In performing the balancing test, the court should consider the nature of the prior crimes, the length of the criminal record, the age and circumstances of the defendant, and "the extent to which it is more important to the search for truth in a particular case for the jury to hear the defendant's story than to know of a prior conviction." *Montgomery*, 47 Ill. 2d at 518.

*Montgomery* does not address the proper time for ruling on the admissibility of a prior conviction. However, recently, in *People v. Patrick*, 233 Ill. 2d 62 (2009), our supreme court addressed the issue of whether a trial court abuses its discretion by delaying ruling on the admissibility of prior convictions until after the defendant's testimony. The court analyzed the cases of two defendants, Robert Patrick and Ezekiel Phillips. Robert Patrick was charged with multiple counts of first-degree murder, attempted first-degree murder, and aggravated discharge of a firearm. Before trial, Patrick filed a motion *in limine* seeking to bar the State from introducing evidence of his prior convictions for purposes of impeachment. The trial judge summarily refused to consider the admissibility of the defendant's prior convictions, holding that it was his procedure in every case, without exception, not to give advisory opinions. The defendant testified, and his testimony was impeached with three prior convictions for possession of a controlled substance. The jury found him guilty of second-degree murder.

Our supreme court recognized that defendants benefit from an early ruling on the admissibility of their prior convictions before they decide to testify. *Patrick*, 233 Ill. 2d at 70, 72-73. Early rulings provide defendants with the "critical decision whether to testify on their own behalf and to gauge the strength of their testimony." *Patrick*, 233 Ill. 2d at 70, citing *People v. Averett*, 381 Ill. App. 3d 1001 (2008). In addition, early rulings permit defendants and their counsel to make reasoned tactical decisions in planning the defense by informing the jury whether the defendant will testify and anticipatorily disclosing prior convictions during the defendant's direct examination, thereby reducing the prejudicial effect. *Patrick*, 233 Ill. 2d at 70.

The court acknowledged that, "in most cases, the trial judge will possess the information necessary to conduct a *Montgomery* hearing before trial." *Patrick*, 233 Ill. 2d at 73. It concluded that "a trial court's failure to rule on a motion *in limine* on the admissibility of

prior convictions when it has sufficient information to make a ruling constitutes an abuse of discretion." *Patrick*, 233 Ill. 2d at 73. In all but the most complicated cases, a judge will have enough information before trial to weigh the probative value of admitting the prior conviction against the danger of unfair prejudice to the defendant. *Patrick*, 233 Ill. 2d at 73.

■ The supreme court held that the trial court abused its discretion by refusing to exercise any specific discretion. *Patrick*, 233 Ill. 2d at 74. "There is no justification for a trial judge's blanket policy to withhold ruling on all motions *in limine* on the admissibility of prior convictions until after a defendant's testimony." *Patrick*, 233 Ill. 2d at 74. Therefore, the court concluded that the trial court's application of a blanket policy amounted to an abuse of discretion. *Patrick*, 233 Ill. 2d at 74-75.

Under *Patrick*, it is clear here that the trial court's refusal to entertain defendant's motion *in limine* before he testified constituted an abuse of discretion. As in *Patrick*, the trial court's ruling was not based on any specific facts. Instead, the court seemed to have a blanket policy of deferring ruling on such motions until after a defendant testifies:

> "But until he testifies I can't raise the probative versus the prejudicial. I understand it may be very helpful for you to have me rule before he testifies, but the standard in *Montgomery* is the [*sic*] besides the age limits and stuff like that is the probative versus prejudicial weighing factor. How can I determine that prior to the testimony? I can't. So I won't."

The *Patrick* court found such refusal to exercise any specific discretion to be an abuse of discretion. *Patrick*, 233 Ill. 2d at 74. As we noted in *Averett*, "Courts should not adopt such a blanket policy but, rather, should engage in the *Montgomery* balancing test on a case-by-case basis, giving thoughtful consideration to each factor. It is a matter of simple fairness that courts should rule on such motions as soon as is practicable." *Averett*, 381 Ill. App. 3d at 1019.

Indeed, while the trial court stated that it needed to hear defendant's testimony before weighing the factors, after he testified, it simply admitted the evidence without discussion. The judge had enough information before trial to weigh the probative value of admitting the prior conviction against the danger of unfair prejudice to defendant. See *Patrick*, 233 Ill. 2d at 73.

We conclude that the trial court abused its discretion when it deferred ruling on defendant's motion *in limine*.

### B. Was the Error Harmless Beyond a Reasonable Doubt?

■ In *Chapman v. California*, 386 U.S. 18, 24, 17 L. Ed. 2d 705,

710-11, 87 S. Ct. 824, 828 (1967), the Supreme Court determined that when an error is of constitutional magnitude, a defendant is entitled to a new trial if the error was not harmless beyond a reasonable doubt. The test to be applied in determining whether a constitutional error is harmless is whether it appears beyond a reasonable doubt that the error at issue did not contribute to the verdict obtained. *People v. Patterson*, 217 Ill. 2d 407, 428 (2005). The State bears the burden of proof. *Patterson*, 217 Ill. 2d at 428.

The *Patrick* court, applying the harmless-beyond-a-reasonable-doubt analysis, rejected the State's argument that Patrick was not prejudiced by the error. *Patrick*, 233 Ill. 2d at 75. Patrick was "substantially prejudiced" because his counsel was unable to inform the jury whether he would testify and was anticipatorily unable to disclose Patrick's prior convictions to lessen the prejudicial effect the convictions would have on his credibility. *Patrick*, 233 Ill. 2d at 75. His decision to testify was "critical" because he relied on a theory of self-defense, and knowing whether his prior convictions were going to be used for impeachment was a vital factor that needed to be weighed. *Patrick*, 233 Ill. 2d at 75. "If Patrick had known before testifying that his prior convictions were going to be admitted, he may have decided not to testify, or at least he could have informed the jury earlier of the prior convictions to lessen the negative impact." *Patrick*, 233 Ill. 2d at 75.

Furthermore, the supreme court found that the impact of the convictions on Patrick's credibility was clear from the State's repeated argument urging the jury not believe a three-time convicted felon. *Patrick*, 233 Ill. 2d at 75-76. The jury's verdict of guilty to second-degree murder indicated that, to some degree, the jury believed that Patrick was justified in his use of force. *Patrick*, 233 Ill. 2d at 76. The court concluded that "we have no doubt that the error in this case was not harmless to Patrick" and reversed his conviction and remanded the case to the trial court. *Patrick*, 233 Ill. 2d at 76.

It is true that, unlike the prosecutor in *Patrick*, who made a "focused and repeated argument urging the jury not to believe a three-time convicted felon" (*Patrick*, 233 Ill. 2d at 75-76), here, the State made no mention of defendant's residential burglary conviction in its closing argument. However, the jury was instructed specifically that "defendant's previous conviction" could be considered "only as it may affect his believability as a witness." Thus, while the State did not make a "focused and repeated argument" about defendant's credibility due to the burglary conviction, the instruction underscored the fact of his conviction.

Furthermore, defendant's decision to testify was critical because he relied on a theory of consent. In *Patrick*, the court found that

Patrick's decision whether to testify was critical because he relied on a theory of self-defense, even though other evidence corroborated his theory. Here, defendant's decision was all the more critical where there was no other testimony to corroborate his theory. As the *Patrick* court noted, if defendant had known before testifying that his prior conviction was going to be admitted, he may have decided not to testify or he could have informed the jury earlier of the prior conviction "to lessen the negative impact." See *Patrick*, 233 Ill. 2d at 75.

The State argues that the error was harmless beyond a reasonable doubt because defendant knew before deciding to testify that his burglary conviction was a crime of dishonesty and how old it was. We note that the trial judge was in a similar position:

> "When applying the *Montgomery* rule before trial, a trial judge will certainly be able to determine whether the prior crime was punishable by death or imprisonment in excess of one year, or involved dishonesty or false statements. Likewise, a trial judge can readily ascertain whether less than 10 years has elapsed since the date of conviction of the prior crime or release of the witness from confinement." *Patrick*, 233 Ill. 2d at 73.

Finally, the State argues that the error was harmless because the evidence supporting defendant's convictions was overwhelming. See *Patterson*, 217 Ill. 2d at 428. We disagree that the evidence was overwhelming. The victim was impeached by her mental-health issues, substance-abuse history, and criminal record, and she could not testify as to where defendant penetrated her. Furthermore, while DNA evidence showed that defendant's semen was found in B.W.'s vagina and anus, defendant admitted that he had anal sex with her, and the parties stipulated that it is possible for semen deposited in the rectum to drain into the vaginal area. The jury did convict defendant only 10 minutes after receiving a transcript of B.W.'s testimony. However, the jury might not have believed all aspects of B.W.'s testimony, since it found that defendant was not armed with a firearm when he committed the crimes, even though B.W. testified that defendant told her that he had a gun, she felt a hard object pressed into her side, and he beat her with that object.

While we find that the evidence was not overwhelming, we reject defendant's argument that the State failed to prove him guilty beyond a reasonable doubt; therefore, we remand the case for a new trial. When a court considers a challenge to a criminal conviction based on the sufficiency of the evidence, its function is not to retry the defendant. *People v. Milka*, 211 Ill. 2d 150, 178 (2004). Rather, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have

found the essential elements of the crime beyond a reasonable doubt. *People v. Woods*, 214 Ill. 2d 455, 470 (2005). Under this standard, a reviewing court must draw all reasonable inferences from the record in favor of the prosecution. *People v. Bush*, 214 Ill. 2d 318, 326 (2005). A court of review will not overturn the fact finder's verdict unless "the proof is so improbable or unsatisfactory that there exists a reasonable doubt of the defendant's guilt." *People v. Maggette*, 195 Ill. 2d 336, 353 (2001). This standard applies equally to sexual-assault cases. *People v. Schott*, 145 Ill. 2d 188, 202-03 (1991).

### 1. *B.W.'s Credibility*

Defendant argues that the State failed to find him guilty beyond a reasonable doubt because B.W.'s inconsistent testimony, drug addictions, mental health problems, felony convictions, and lies to the police rendered her incredible. "[I]t is the function of the jury as the trier of fact to assess the credibility of the witnesses, the weight to be given their testimony, and the inferences to be drawn from the evidence." *People v. Tenney*, 205 Ill. 2d 411, 428 (2002). It is also for the trier of fact to resolve conflicts or inconsistencies in the evidence, and a " 'conviction will not be reversed "simply because the defendant tells us that a witness was not credible." ' " *Tenney*, 205 Ill. 2d at 428, quoting *People v. Brown*, 185 Ill. 2d 229, 250 (1998), quoting *People v. Byron*, 164 Ill. 2d 279, 299 (1995). "[T]his court will not substitute its judgment for that of the jury on questions involving the weight of the evidence or the credibility of the witnesses." *Tenney*, 205 Ill. 2d at 428.

Defendant argues that B.W.'s drug addiction damaged her credibility. B.W. testified that she was addicted to heroin and had used it off and on starting when she was 18, and she used crack cocaine "for a short period of time." *People v. Adams*, 259 Ill. App. 3d 995, 1004 (1993), a case cited by defendant, held that "narcotics addiction has an important bearing upon the credibility of a witness, and, in this regard, counsel may use legitimate methods to attach such a witness' credibility." More specifically, the question as to whether a witness is a narcotics addict at the time of testifying or at the time of the event is a proper subject of cross-examination. *Adams*, 259 Ill. App. 3d at 1004. Here, defense counsel cross-examined B.W. on her addiction and, having heard this testimony, the jury convicted defendant. In addition, Dr. Johnson, the emergency room physician, testified that B.W. showed no signs of being under the influence of drugs or alcohol when he examined her.

Defendant also cites B.W.'s mental-health history. In March 2001, approximately three months before the assault, she was found to have

"major psychotic symptoms," including voices telling her to kill herself. At that time, she was diagnosed with substance-abuse-induced mood disorder, depression, thought disorder with hallucinations, and heroin and cocaine use. B.W. was prescribed an antipsychotic medication used for the treatment of schizophrenia and mania associated with bipolar disorder, and another that is used to treat depression, obsessive-compulsive disorder, panic disorder, post-traumatic stress disorder, premenstrual dysphoric disorder, and social anxiety disorder. Although B.W. testified that she was on medication on June 21, 2001, it is unclear what those medications were. Furthermore, Dr. Johnson testified that she was oriented times three, she never appeared to be illogical, and her communication skills and eye contact were good.

" 'It may be broadly stated that in determining credibility of a witness or the weight to be accorded his testimony, regard is generally given to his mental condition. Almost any emotional or mental defect may materially affect the accuracy of the testimony.' " *People v. Plummer*, 318 Ill. App. 3d 268, 279 (2000), quoting *People v. Phipps*, 98 Ill. App. 3d 413, 416 (1981). The mental-health history of a witness is relevant as it relates to her credibility and it is a permissible area on impeachment. *Plummer*, 318 Ill. App. 3d at 279. As with B.W.'s addiction, defense counsel thoroughly cross-examined her on her mental-health issues.

Defendant next points to B.W.'s five previous felony convictions and the false names that she gave the police. He cites *People v. Montgomery*, 47 Ill. 2d 510 (1971), in support of his argument; however, *Montgomery* simply acknowledges that under certain circumstances, a defendant may be impeached by his previous crimes. See also *People v. Jacobs*, 308 Ill. App. 3d 988, 993 (1999). The jury heard evidence that B.W. was previously convicted of five felony convictions, including retail theft, forgery, and possession of a controlled substance, and that when she was arrested for these offenses, she lied to the police about her name and date of birth.

B.W.'s testimony also contradicted nurse Julia Scott's on two points. At trial, B.W. made no mention of engaging in oral sex with defendant, while Scott reported that B.W. said "there was oral copulation of genitals of [B.W.]" B.W. also testified at trial that she had intercourse with Campbell the night before the assault, while Scott testified that B.W. responded that she had not engaged in sexual activity within 72 hours of the assault. As the State points out, however, B.W. was very emotional, traumatized, and suffering from painful injuries while she was at the hospital. Furthermore, where "inconsistencies and conflicts exist in the evidence, the trier of fact has the responsibility of weighing the credibility of the witnesses and resolv-

ing the conflicts and inconsistencies." *People v. Aguilar*, 218 Ill. App. 3d 1, 8 (1991).

Defendant also argues that B.W.'s testimony was vague. For example, B.W. testified that defendant pushed her to the ground, but she did not have any scratches on her arms and legs, and she did not know with what object defendant struck her. However, Dr. Johnson noted bruises to B.W.'s lower leg, and she also suffered from numerous facial injuries, broken teeth, and bruises to her breast and neck.

More problematic is B.W.'s inability at trial to remember where defendant penetrated her. Although Dr. Johnson testified that she told him she was sexually assaulted rectally and then vaginally, B.W. testified at trial that defendant inserted his penis inside of her just before she blacked out. Defendant's semen was found in her vagina and anus, and while her vagina did not show signs of injury, her anus did.

Defendant cites *People v. Schott*, 145 Ill. 2d 188, 206-07 (1991), which found that the defendant's conviction for aggravated indecent liberties with a child was not proven beyond a reasonable doubt because the victim was impeached numerous times and her testimony was so fraught with inconsistencies and contradictions that it lacked credibility. She had falsely accused her uncle of the same act and later said she was lying because she was angry with him. She gave inconsistent accounts as to how many times and what time of year the incident happened. She also recanted her allegations against the defendant to four people, and damage to her vaginal region could have been caused by other admitted sexual activity. Similarly, in *People v. Yeargan*, 229 Ill. App. 3d 219 (1992), the victim's account was incredible where she was uninjured, no seminal material was found on her clothing, and she did not fight back when accosted, despite being 5 feet 8 inches and 180 pounds. It was further incredible that she walked into a dark alley, despite being followed by two strangers who had just propositioned her, and that after the assault, she could have dressed in the dark from a state of total nudity to follow the defendant to his car.

Here, while there were some inconsistencies in B.W.'s testimony, they are not close to the level found reversible in *Schott* and *Yeargan*. Unlike the victim in *Schott*, who recanted her allegations to four people and falsely accused her uncle of the same act, B.W. never recanted her allegations of rape against defendant, and there was no evidence that she falsely accused anyone of rape in the past. Further, while damage to the *Schott* victim's vaginal area could have been caused by other admitted sexual activity, here, there was no evidence that B.W.'s fresh rectal laceration and injury to her intergluteal area were caused by other activity. *Yeargan* is also distinguishable because B.W. was injured—she had rectal injuries, bruises around her neck, a broken

nose, loose teeth, and facial swelling—and defendant's DNA was found in B.W.'s rectal and vaginal swabs.

The arguments that defendant makes before this court "were also made to the jury below and we, therefore, will not usurp its role in determining whether they raised a reasonable doubt." *People v. Rojas*, 359 Ill. App. 3d 392, 398 (2005).

### 2. *Vaginal Penetration*

Defendant argues that even if this court does not reverse all of his convictions, it must nonetheless reverse the conviction for aggravated criminal sexual assault based on vaginal penetration.

The indictment alleged that defendant "committed an act of sexual penetration, upon [B.W.], to wit: contact between Albert Hogan's penis and [B.W.'s] vagina." A person commits aggravated criminal sexual assault if he "commits an act of sexual penetration by the use of force or threat of force" and causes bodily harm to the victim. 720 ILCS 5/12—13(a)(1), 12—14(a)(2) (West 2004). "Sexual penetration" is defined as follows:

> "any contact, however slight, between the sex organ or anus of one person by an object, the sex organ, mouth or anus of another person, or any intrusion, however slight, of any part of the body of one person *** into the sex organ or anus of another person, including but not limited to *** anal penetration. Evidence of emission of semen is not required to prove sexual penetration." 720 ILCS 5/12—12(f) (West 2004).

Whether penetration occurs is a question of fact, and a lack of detail in a witness' testimony only affects the weight of the evidence. *People v. Bell*, 234 Ill. App. 3d 631, 636 (1992).

B.W. consistently testified that she did not know where defendant penetrated her. During the State's direct examination, B.W. testified as follows:

> "MR. SHEARER [Assistant State's Attorney]: Now, as you're down on your face and your pants are removed, what happened next?
>
> B.W.: He inserted his penis inside of me.
>
> MR. SHEARER: Inside of what part of your body?
>
> B.W.: I'm not for sure. I blacked out."

During defendant's cross-examination, she further testified as follows:

> "MR. PFEIFER [defense attorney]: Okay. And while he was having sex with you, that's when you went unconscious?
>
> B.W.: Yes, I did.
>
> MR. PFEIFER: And which—how were you having sex with him? Was that anal sex?
>
> B.W.: Didn't I just tell you I passed out? I don't know what part

he inserted in. When I went to the hospital, when they did the rape kit, that's what was revealed to me.

\* \* \*

MR. PFEIFER: Well, what you did, you're saying he was having sex with you, and that's when you passed out?

B.W.: That's what I just said.

MR. PFEIFER: Was that anal sex, or was that vaginal sex?

B.W.: Once again, let me tell you, I don't remember what entry it was. When I got to the hospital, that's when they revealed it to me."

In addition, defendant admitted having anal sex with B.W. but denied having vaginal sex, and although Dr. Johnson, the emergency room physician, found a rectal laceration and an injury to the intergluteal area consistent with forcibly stretching apart the buttocks, he did not find any vaginal trauma. The parties also stipulated that it is possible for semen deposited in the rectum to drain into the vaginal area.

However, the semen found in B.W.'s vagina was evidence of vaginal penetration, as was Johnson's testimony that B.W. reported being "sexually assaulted rectally and then vaginally." Furthermore, the cases that defendant relies upon are distinguishable. In *People v. Anderson*, 20 Ill. App. 3d 840 (1974), the court was suspicious of the lack of vaginal injury, since the victim had testified that she was a virgin at the time of the alleged assault and the defendant had difficulty penetrating her. The victim also had several opportunities to make an outcry for help or escape, but she did not. In *People v. DeWeese*, 298 Ill. App. 3d 4 (1998), the victim's mother and grandmother testified that she told them that the defendant shoved perfume bottles up her vagina. However, the victim testified that she forgot what happened, no medical evidence supported the charge, and the defendant denied the accusations. On appeal, the court found that the trial court could rationally determine that the State did not prove an act of sexual penetration. Finally, in *Maggette*, 195 Ill. 2d 336, the supreme court found the victim's testimony that the defendant rubbed her vagina over her underwear and her "brief and vague reference to her vaginal area" insufficient to prove penetration. Here, there is evidence supporting the charge: defendant's semen was found in B.W.'s vagina and Johnson testified that B.W. reported being "sexually assaulted rectally and then vaginally." She also reported the rape to the police immediately.

After viewing the evidence in the light most favorable to the prosecution, we conclude that any rational trier of fact could have found the essential elements of aggravated kidnapping and aggravated

criminal sexual assault based on anal and vaginal penetration beyond a reasonable doubt. *Woods*, 214 Ill. 2d at 470.

We conclude that the State failed to demonstrate that the trial court's deferral of its ruling on defendant's motion *in limine* was harmless beyond a reasonable doubt. Accordingly, we reverse defendant's convictions and remand for a new trial. Because we found the evidence in this case sufficient to convict defendant, there is no double-jeopardy impediment to a new trial. *People v. Wheeler*, 226 Ill. 2d 92, 134 (2007).

## III. CONCLUSION

For the foregoing reasons, we reverse defendant's convictions and remand for retrial. In light of this holding, we decline to address the additional arguments that defendant raised on appeal.

Reversed; cause remanded.

THEIS and COLEMAN, JJ., concur.