# Illinois Official Reports

## Appellate Court

---

### *People v. Denis*, 2018 IL App (1st) 151892

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. VICTOR DENIS, Defendant-Appellant. |
| District & No. | First District, First Division<br>Docket No. 1-15-1892 |
| Filed | November 19, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 10-CR-15639; the Hon. Gregory Robert Ginex, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Michael J. Pelletier, Patricia Mysza, and Ross E. Allen, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Mary L. Boland, and Lisanne P. Puliese, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE GRIFFIN delivered the judgment of the court, with opinion.<br>Justices Pierce and Walker concurred in the judgment and opinion. |

**OPINION**

¶ 1    During an argument in 2010, M.D., the minor victim in this case, told her mother that she had been raped as a young child. The next day, M.D. identified her rapist as defendant Victor Denis. M.D.'s mother alerted the police, and defendant was arrested for his alleged commission of sexual acts against M.D. on two separate occasions in 1999. Defendant was read his *Miranda* rights (see *Miranda v. Arizona*, 384 U.S. 436 (1966)) and confessed during a police interview. Six hours later, defendant gave a written confession. Defendant said he raped M.D. on one occasion and placed M.D.'s hand on his penis on another occasion.

¶ 2    Defendant was arrested and charged with one count of predatory criminal sexual assault of a child (720 ILCS 5/12-14.1(a)(1) (West 1998)[1]), three counts of criminal sexual assault (*id.* § 12-13(a)(2), (a)(3)[2]), and four counts of aggravated criminal sexual abuse (*id.* § 12-16(c)(1)(i)).

¶ 3    Before trial, defendant asked the trial court for a fitness determination. The trial court granted his request and found defendant fit to stand trial. Defendant filed a motion to suppress his confession, which proceeded to a hearing. The trial court heard testimony from defendant's expert witness that he had an IQ of 73 and a limited mental capacity. The State's expert witness testified that, despite his limited mental capacity, defendant understood his *Miranda* rights and understood his actions in 1999. The trial court denied defendant's motion.

¶ 4    The case proceeded to a bench trial, and the trial court found defendant guilty of criminal sexual assault (*id.* § 12-13(a)(2)) and aggravated criminal sexual abuse (*id.* § 12-16(c)(1)(i)[3]). The trial court sentenced defendant to serve three- and five-year terms of imprisonment, respectively, and ordered the sentences to run concurrently. The trial court denied defendant's posttrial motions. As a result of his convictions, defendant was required to register as a sex offender for the remainder of his natural life under the Sex Offender Registration Act (SORA) (730 ILCS 150/1 *et seq.* (West 2014)).

¶ 5    Defendant appeals his convictions, arguing that (1) the evidence was insufficient to prove him guilty of aggravated criminal sexual abuse (720 ILCS 5/12-16(c)(1)(i) (West 1998)) and criminal sexual assault (*id.* § 12-13(a)(2)) beyond a reasonable doubt, (2) the State failed to prove beyond a reasonable doubt that defendant knew M.D. was unable to understand the nature of his sexual act and unable to give knowing consent to it, (3) the trial court erred when it allowed M.D.'s mother to testify that M.D. had been raped by defendant, (4) the trial court erred when it ordered defendant to serve a longer mandatory supervised release term than was in effect when he committed the sexual act that supported his conviction for criminal sexual assault (*id.*), and (5) SORA and related statutes are facially unconstitutional.

---

[1]Public Act 96-1551 (eff. July 1, 2011) amended section 12-14.1 and renumbered it as section 11-1.40. See 720 ILCS 5/11-1.40 (West 2014).

[2]Public Act 96-1551 (eff. July 1, 2011) amended section 12-13 and renumbered it as section 11-1.20. See 720 ILCS 5/11-1.20 (West 2014).

[3]Public Act 96-1551 (eff. July 1, 2011) amended section 12-16 and renumbered it as section 11-1.60. See 720 ILCS 5/11-1.60 (West 2014).

¶ 7        M.D. and her mother got into an argument in July 2010. During the argument, M.D. told her mother that she had been raped as a young child. The next day, M.D. revealed the identity of the alleged rapist: her cousin, defendant Victor Denis. M.D.'s mother reported the information to the Cicero Police Department, and Detective Jason Stroud was assigned to investigate the case.

¶ 8        Following an initial interview with M.D. at the police station, Detective Stroud went to M.D.'s home where she identified defendant in a photo array. Detective Stroud and his partner set out to locate defendant and found him at his home. Defendant agreed to speak with the Detectives and accompanied them to the police station for an interview. At the station, Detective Stroud read defendant his *Miranda* rights and asked defendant if he understood them. Defendant answered in the positive. Defendant proceeded to read his *Miranda* rights, initialed and signed a preprinted *Miranda* form, and said he wanted to speak with the police. After Detective Stroud informed defendant of M.D.'s allegations, he wanted to give his side of the story.

¶ 9        Defendant told Detective Stroud that two "incidents" occurred, when he was 18 years old and M.D. was 7, but he could not remember which incident happened first. One of the incidents occurred at M.D's home. Defendant and M.D. were sitting on the couch with a blanket covering them. Defendant stated that M.D. wanted to touch defendant's penis, so he let her. M.D. touched defendant's penis in an up-down motion.

¶ 10       The other incident occurred in M.D's room. Defendant stated that he was with M.D. on her bed when she asked defendant to have sex. Defendant took off his pants, and M.D. took off her pants. Defendant placed his penis in her vagina for five minutes. After defendant made these statements, Detective Stroud contacted Assistant State's Attorney Randall Tyner.

¶ 11       Before interviewing defendant, Tyner reread defendant his *Miranda* rights with Detective Stroud present. Defendant said he understood his *Miranda* rights, agreed to speak with Tyner, and further agreed to give a written statement. Tyner typed out defendant's five-page written statement on a computer and read the statement aloud. Defendant's statement started with his personal history: he finished the tenth grade, lived on his own in California before moving back to Illinois to live with his mother and grandmother, and worked construction jobs without steady work. Defendant then explained what happened with M.D. on two occasions in 1999.

¶ 12       Defendant stated that in the fall of 1999, when he was 18 years old and M.D. was 7, defendant helped M.D.'s mother move into a new house in Cicero. Defendant would often spend the night there, and on one occasion in the winter of 1999, M.D. asked if she could see his private area and touch his penis. Defendant stated that he allowed M.D. to touch his erect penis and that she grabbed and rubbed it for a couple minutes. Defendant moved her hand away and told her not to tell anyone what happened.

¶ 13       Defendant further stated that on a second occasion in the winter of 1999, he was at M.D.'s house. This time, M.D. and defendant were alone in M.D.'s bedroom. After defendant removed his pants, M.D. removed her pants, and defendant took his penis and put it inside of M.D.'s vagina. Defendant stated that he had an erection, and after about five minutes, removed his penis from M.D. and ejaculated on her bed. He told M.D. not to tell anyone what happened.

¶ 14       Defendant was placed under arrest and charged with one count of predatory criminal sexual assault of a child (count I) (*id.* § 12-14.1(a)(1)); two counts of criminal sexual assault,

which alleged that defendant knew that M.D. was unable to understand the nature of the act and unable to give knowing consent (counts II and III) (*id.* § 12-13(a)(2)); one count of criminal sexual assault, which alleged that defendant was M.D.'s family member (count IV) (*id.* § 12-13(a)(3)); and four counts of aggravated criminal sexual abuse (counts V, VI, VII, and VIII) (*id.* § 12-16(c)(1)(i)).

¶ 15    Before trial, defendant asked the trial court for an expert to determine whether he (1) was fit to stand trial, (2) understood his *Miranda* rights, and (3) understood his actions in the winter of 1999. The trial court granted defendant's request. Defendant was examined by Dr. Fidel Echevarria, who submitted a letter to the trial court indicating that, in his opinion, defendant was mentally fit to stand trial, understood his *Miranda* rights, and would have understood his actions during the time period indicated in the indictment: between August 1999 and December 1999. Defendant filed a motion to suppress his confession as involuntary, arguing that the police coerced his confession and he was unable to comprehend his *Miranda* rights. Defendant's motion proceeded to a hearing.

¶ 16    Defendant testified at the hearing and stated that the police made a promise that he could go home. He testified that was he was read his *Miranda* rights, initialed and signed the *Miranda* form, and signed his written statement. He was not threatened to give his written statement, and no one told him what to include in his statement. Defendant did, however, testify that he did not understand all of his *Miranda* rights. Defendant's expert witness, psychologist Theresa Schaeffer, testified next.

¶ 17    Schaeffer interviewed defendant in 2008 when he was 26 years old. Schaeffer testified that she tested defendant's cognitive abilities under the Wechsler Adult Intelligence Scale, third edition (WAIS), and the Wide Range Achievement Test, fourth edition (WRAT). The WAIS was an intellectual quotient (IQ) test, while the WRAT assessed and assigned grade levels to academic categories (spelling, math, reading, and sentence comprehension). Schaeffer testified that the WAIS placed defendant's IQ at 73, which indicated that he had borderline intellectual function. Schaeffer testified that an IQ of 69 would indicate a mental deficiency. The results of defendant's WRAT were also low and indicated to Schaeffer that "it would be questionable whether or not [defendant] processes or comprehends things much the way a person in the average range of intelligence would."

¶ 18    The State called Dr. Echevarria, who had previously examined defendant and determined he was fit to stand trial. Dr. Echevarria testified to having reviewed Schaeffer's report and concluded that her findings were consistent with his observations of defendant. Dr. Echevarria then testified about how his interview of defendant proceeded. First, Dr. Echevarria assessed defendant's ability to follow instructions. Second, he asked defendant questions about the criminal process. Third, Dr. Echevarria focused on *Miranda* rights and their meaning.

¶ 19    Dr. Echevarria concluded that defendant appeared to appreciate a reasonable understanding of *Miranda* rights and understood his actions in 1999. Agreeing that defendant had borderline intellectual function, Dr. Echevarria testified that defendant could learn but that the learning process was slower and required repetition and reinforcement. Dr. Echevarria admitted on cross-examination that a defendant can learn *Miranda* rights while in custody and through prolonged exposure to the justice system.

¶ 20    The trial court denied defendant's motion to suppress his confession, ruling:

> "There's no doubt in this Court's mind that Mr. Denis has some borderline intellectual deficiency. *** However, none of that in this Court's mind indicates that the Defendant

was not able to not only appreciate what was said, he was able to understand what was said. The statement was given freely and voluntarily, and I do not find there were any promises. I do not find, and this record will be clear, that because of any actions of the police or State's attorney or anyone, the Defendant's will was overcome."

The case proceeded to a bench trial.

¶ 21 M.D., who was 22 years old at the time of trial, testified that she was 7 years old when defendant, her first cousin, raped her. M.D. testified that she and defendant would hang out together and that she regarded him as "part of the family." M.D. testified that, in November or December 1999, her family moved into a new home and, for the first time, she had her own bedroom. She wanted to show defendant her new bedroom and "Barbie" sheets. M.D. testified that she and defendant were in her bedroom when defendant took off his pants, removed her pants, and penetrated her vagina with his erect penis. Defendant then "pulled out," and M.D. noticed a wet substance on her sheets. Defendant told M.D. that the wet substance was for her and not to tell anyone about what happened.

¶ 22 M.D. testified to another incident that occurred in late 1999. She and defendant were at her house watching television. They were on the couch with a blanket covering them. Defendant placed her hand directly on his erect penis and moved her hand "multiple times" on his penis. Defendant pulled up his pants and told M.D. not to tell anyone about what happened.

¶ 23 M.D. did not tell anyone what happened because she was afraid, did not understand what was going on, and "did not know what would happen or if [she] would be in trouble." Years later, M.D. told her friends what happened in the form of a secret.

¶ 24 M.D. further testified about telling her mother that she had been raped by defendant. In July 2010, M.D. was living in her mother's home with M.D.'s newborn daughter. M.D. and her mother got into an argument, and M.D. stated "you act like you're the only one that was raped *** I was also raped." M.D.'s mother had previously told M.D. that she had been raped. However, this was the first time M.D. told her mother that she too had been raped. In a conversation the next day, M.D. told her mother that defendant had raped her.

¶ 25 M.D.'s mother testified that in July 2010 she got into an argument with M.D. and, during the argument, M.D. told her that she had been raped. Defense counsel objected to the statement as hearsay, highlighting the State's failure to file a motion pursuant to section 115-10 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-10 (West 2014)), which allows a witness to testify to a child's hearsay statement under certain circumstances that safeguard the statement's reliability. The trial court overruled the objection, stating that "[t]here's been no 115-10, correct; but this is an outcry. I believe it's relevant and permissible." M.D.'s mother continued to testify that, the day after their argument, M.D. told her that it was defendant who raped her. Defense counsel again objected to the statement as hearsay. The trial court overruled the objection.

¶ 26 Detective Stroud testified that he interviewed M.D., spoke with her high school friends, and then interviewed M.D. a second time. Detective Stroud testified that he located defendant, who agreed to accompany him and his partner to the police station. Detective Stroud read defendant his *Miranda* rights, and within the hour, defendant confessed to having committed sexual acts against M.D. on two separate occasions about 10 years earlier.

¶ 27 Detective Stroud testified that he contacted Tyner, who reread defendant his *Miranda* rights. Defendant agreed to speak with Tyner and to give a written statement. Tyner typed out

defendant's statement and read the statement aloud, and all parties signed the statement. Defendant gave his written statement after spending six hours at the police station. Detective Stroud stressed that he had no idea defendant suffered from any cognitive issues.

¶ 28 The State rested its case, and defendant moved for a directed finding. The trial court granted defendant's motion in part and dismissed count IV of the indictment because defendant was M.D.'s first cousin and not a family member under the criminal sexual assault statute. See 720 ILCS 5/12-12(c) (West 1998); *id.* § 12-13(a)(3).

¶ 29 By way of stipulation, defendant submitted the testimony of Schaeffer given at the hearing on defendant's motion to suppress his confession. In rebuttal and also by way of stipulation, the State submitted the testimony of Dr. Echevarria given at the same hearing.

¶ 30 The trial court found defendant guilty of two counts of criminal sexual assault (counts II and III) (*id.* § 12-13(a)(2)) and two counts of aggravated criminal sexual abuse (counts V and VI) (*id.* § 12-16(c)(1)(i)). The trial court found defendant not guilty of one count of predatory criminal sexual assault of a child (count I) (*id.* § 12-14.1(a)(1)) and two counts of aggravated criminal sexual abuse (counts VII and VIII) (*id.* § 12-16(c)(1)(i)).

¶ 31 Defendant filed a motion for a new trial, asking the trial court to reconsider its finding of guilt because the State failed to prove beyond a reasonable doubt that defendant knew M.D. was unable to understand the nature of or knowingly consent to his sexual act. See *id.* § 12-13(a)(2). The trial court denied defendant's motion.

¶ 32 The trial court merged count III into count II and count VI into count V. The trial court sentenced defendant to serve five years' imprisonment on count II with a mandatory supervised release period of three years to life. The trial court sentenced defendant to serve three years' imprisonment on count V with a mandatory supervised release period of two years. Over the State's objection, the trial court ordered defendant's sentences to run concurrently. Defendant's convictions triggered mandatory lifetime registration under SORA. Defendant filed a motion to reconsider his sentence, which was denied. Defendant appeals his convictions.

¶ 33                              ANALYSIS

¶ 34 The issues on appeal are (1) whether any rational trier of fact could have found defendant guilty of aggravated criminal sexual abuse (*id.* § 12-16(c)(1)(i)) and criminal sexual assault (*id.* § 12-13(a)(2)) beyond a reasonable doubt, (2) whether the State proved beyond a reasonable doubt that defendant knew M.D. was unable to understand the nature of his sexual act and unable to give knowing consent to it, (3) whether the trial court erred when it allowed M.D.'s mother to testify that M.D. had been raped by defendant, (4) whether the trial court erred when it ordered defendant to serve a longer mandatory supervised release term than was in effect when he committed the sexual act that supported his conviction for criminal sexual assault, (5) whether SORA and separate statutes are facially unconstitutional.

¶ 35                    I. Sufficiency of the Evidence

¶ 36 Defendant argues that the evidence does not support the trial court's finding of guilt beyond a reasonable doubt. We view the evidence in a light most favorable to the State to determine whether any rational trier of fact could have found the elements of aggravated criminal sexual abuse (*id.* § 12-16(c)(1)(i)) and criminal sexual assault (*id.* § 12-13(a)(2))

beyond a reasonable doubt. *People v. Bradford*, 2016 IL 118674, ¶ 12. All reasonable inferences from the evidence are drawn in the State's favor and we will not reverse defendant's convictions unless the evidence is so unreasonable, improbable, or so unsatisfactory as to justify a reasonable doubt of his guilt. *Id.*

¶ 37    In order to sustain a finding of guilt beyond a reasonable doubt on the charges of criminal sexual assault (720 ILCS 5/12-13(a)(2) (West 1998)), the State was required to show that defendant committed an act of sexual penetration against M.D. (contact between defendant's penis and M.D.'s vagina) knowing she was unable to understand the nature of defendant's sexual act and unable to give knowing consent to it.

¶ 38    As to the charges of aggravated criminal sexual abuse (*id.* § 12-16(c)(1)(i)), the State was required to show that defendant was 17 years of age or over when he knowingly committed an act of sexual conduct against M.D. (placed M.D.'s hands on defendant's penis) and that M.D. was under the age of 13 when the act was committed. Sexual conduct is any knowing touching or fondling by the victim or the accused, either directly or through clothing, of the sex organs or any part of the body of a child under the age of 13 for the purpose of sexual gratification or arousal of the victim or the accused. See *id.* § 12-12(e).

¶ 39    Defendant's challenge to the sufficiency of the evidence is twofold. He argues that M.D.'s testimony was not credible and defendant's written confession was unworthy of belief.

¶ 40                    A. The Credibility of M.D.'s Testimony

¶ 41    Defendant argues that M.D.'s bipolar disorder and depression diagnoses affected her credibility and raised reasonable doubt of defendant's guilt. At trial, M.D. and her mother testified that M.D. was diagnosed with bipolar disorder and later rediagnosed with depression. M.D. testified that she was prescribed an antidepressant and then denied having experienced any "hallucinations or delusion" prior to her diagnosis on cross-examination.

¶ 42    Illinois courts have broadly stated that almost any emotional or mental defect may materially affect the accuracy of a witness's testimony and, therefore, due regard should be given to witnesses' mental condition when determining credibility. *People v. Hogan*, 388 Ill. App. 3d 885, 896 (2009). The trial court offered the following on the issue of M.D.'s diagnoses:

> "[M.D.] was diagnosed as bipolar, although the record doesn't indicate why. It doesn't indicate whether she was on any medication or whether—or how long she was diagnosed except to say that she believes she got some antidepressant medication. That's all. The record doesn't indicate anything further. *** Again, nothing in the record indicates medication, what the prognosis is, how severe that particular bipolar is or what the reason was for it."

¶ 43    A review of the record clearly indicates that defendant failed to show *how* M.D.'s diagnoses materially affected the accuracy of her testimony or compromised her ability to perceive, relate, or remember the occurrences to which she testified. See *People v. Bean*, 137 Ill. 2d 65, 102 (1990) (mental health records that failed to reveal the witness to be lacking in her abilities to perceive, remember, or relate the occurrences about which she testified were irrelevant). We reject defendant's unsupported assertion that her diagnoses affected her credibility and defer to the trial court's finding that M.D. was credible. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009) (reversal of a conviction is not warranted where

- 7 -

defendant simply claims that a witness was not credible).

¶ 44                                B. M.D.'s Delayed Outcry

¶ 45    Defendant argues that M.D.'s testimony is not credible because she waited more than 10 years to tell her mother that she was raped. The State argues that the delay was reasonable.

¶ 46    We refuse to allow an hourglass to determine whether M.D.'s outcry was reasonable. See *People v. Bowen*, 241 Ill. App. 3d 608, 620 (1993) ("[t]o fix a time limit in which a complaint must be made with the police in order for a victim's testimony to be deemed credible would place an unnecessary burden on the victim and trivialize defendant's actions"). Victims of sexual abuse are often threatened by their abusers not to disclose the improper sexual conduct. *People v. Zwart*, 151 Ill. 2d 37, 45 (1992) (recognizing that a child's delay in reporting abuse may be explained by the fact that victims are often threatened not to tell anyone about the abuse). M.D.'s testimony illustrates the point.

¶ 47    On cross-examination, M.D. testified that "[defendant] was family. I didn't know if, I didn't know if that was right or wrong. I didn't understand what was going on." When asked on direct examination why she did not tell anyone about the incidents in 1999, M.D. provided the following answer: "I did not understand and I was afraid. I was afraid of the fact that I did not understand what was going on. And I did not know what would happen or if I would be in trouble." M.D. learned about what happened to her in sexual education class and became afraid of defendant when she realized that what he had done "wasn't right." More importantly, M.D. testified that defendant told her not to tell anyone about the sexual acts.

¶ 48    We hold that M.D.'s silence was not unreasonable, as it was attributed to fear, shame, guilt, and embarrassment. *Bowen*, 241 Ill. App. 3d at 620. The trial court, within its exclusive province, found M.D.'s testimony to be credible, and we agree with its reasoned determination (see *People v. Ortiz*, 196 Ill. 2d 236, 267 (2001) (reversal of a defendant's conviction is warranted when based upon testimony that is improbable, unconvincing, or contrary to human experience)):

> "I noted that [M.D.] had great difficulty testifying. I noted that when the questions were asked of her, she tried to answer them but could not. There was some hesitation, and at one time, we actually took a break so she could compose herself. I totally understand that this was an extremely difficult and emotional situation. But I weigh that consideration of the credibility of [M.D.]
>
> One of the things that she testified to was that she didn't understand what went on, that she was afraid. She was afraid. She didn't know what to do because she thought she'd be in trouble, which is extremely understandable natural thought process for a child. She didn't want to tell on her cousin. She didn't want to tell about either of these incidents and she was embarrassed and she was afraid."
>
> * * *
>
> In looking at all the evidence in this case, I see that the victim has testified to certain things and I find her extremely credible."

¶ 49    We reject defendant's additional assertions that M.D.'s outcry was unreliable because: (1) it was made shortly after she gave birth and (2) M.D. remained silent when M.D.'s mother stated, on previous occasions, that she had been raped. These arguments are cursory,

unsupported, undeveloped, and unpersuasive.

¶ 50                    C. The Credibility of Detective Stroud's Testimony

¶ 51      Defendant argues that Detective Stroud's testimony was not credible and, as a result, defendant's written confession was unworthy of belief. Defendant's argument focuses on (1) Detective Stroud's statement that he did not notice any cognitive disability on the part of defendant when he interviewed him and (2) purported inconsistencies between Detective Stroud's testimony and the evidence presented by Schaeffer (defendant had an IQ of 73 and read at the third-grade level).

¶ 52      The trial court heard Detective Stroud's testimony twice (at the hearing on defendant's motion to suppress his confession and at trial) and took no issue with his statement that defendant used the word "incidents" when describing his sexual contacts with M.D. Similarly, the trial court determined Detective Stroud's testimony, that he did not notice defendant's cognitive disabilities while interviewing him, to be credible. We will not second-guess the trial court's well-informed credibility determination here. See *People v. Austin M.*, 2012 IL 111194, ¶ 190; *People v. Wheeler*, 226 Ill. 2d 92, 114-15 (2007) (trier of fact is best equipped to judge the credibility of witnesses and due consideration must be given to the fact that it was the trial court that saw and heard the witnesses). Defendant's argument (his written confession was unworthy of belief) was dependent upon a finding that Detective Stroud's testimony was not credible. Therefore, we need not address it.

¶ 53      We hold that the evidence was not so improbable, unsatisfactory, or inconclusive as to warrant a reversal of defendant's conviction for aggravated criminal sexual abuse (720 ILCS 5/12-16(c)(1)(i) (West 1998)). See *People v. Beauchamp*, 241 Ill. 2d 1, 8 (2011). Defendant's written confession and M.D.'s positive and credible testimony (when she was 7 years old and defendant was older than 17 he placed her hands on his penis) was sufficient to convict defendant of his sexual offense. We now turn to address defendant's argument that the State failed to prove him guilty of criminal sexual assault beyond a reasonable doubt. 720 ILCS 5/12-13(a)(2) (West 1998).


¶ 54                              D. Defendant's Knowledge

¶ 55      Defendant's primary argument on appeal is that the State failed to prove beyond a reasonable doubt that he knew M.D. was unable to understand the nature of the sexual act and unable to give knowing consent to it. See *id.* ("[t]he accused commits criminal sexual assault if he or she *** commits an act of sexual penetration and the accused knew that the victim was unable to understand the nature of the act or was unable to give knowing consent"). The State contends that it proved defendant's knowledge under section 12-13(a)(2) with circumstantial evidence. Our analysis of this issue is controlled by *People v. Lloyd*, 2013 IL 113510.

¶ 56      In *Lloyd*, our supreme court held that a conviction under section 12-13(a)(2) requires proof beyond a reasonable doubt that the defendant knew of some fact, other than the victim's young age, that prevented the victim from understanding the nature of or giving knowing consent to the sexual act. *Id.* ¶ 40. The court's research revealed not one reported case where a defendant's prosecution under section 12-13(a)(2) was based solely upon evidence of his or her knowledge of the victim's legal status as a minor. *Id.* ¶ 39. The court did, however, find a number of cases where the State met its burden of proof by showing that (1) the victim was severely mentally disabled, highly intoxicated, unconscious, or asleep and (2) the defendant

knew the victim's state of mind prevented him or her from understanding the nature of or giving knowing consent to the sexual act. *Id.* One of those cases cited by the court was *People v. Maloney*, 201 Ill. App. 3d 599 (1990), which is instructive here.

¶ 57    In *Maloney*, the defendant was convicted of sexually assaulting a 15-year-old victim who had the mental age of a 7-year-old. *Id.* at 611. On appeal, the defendant challenged the sufficiency of the evidence arguing that the State failed to prove his knowledge under the criminal sexual assault statute (Ill. Rev. Stat. 1987, ch. 38, ¶ 12-13(a)(2)) beyond a reasonable doubt. *Maloney*, 201 Ill. App. 3d at 610. The court analyzed the evidence and found that a trier of fact could have inferred defendant's knowledge from his brief observation of and interaction with the victim. *Id.* at 611.

¶ 58    The *Maloney* court reviewed the record and found that the defendant had "ample opportunity" to assess, and became aware of, the victim's limited mental capacity before the defendant committed the sexual act that supported his conviction. *Id.* The defendant encountered his victim reading a " 'Bugs Bunny' comic book" and took a seat next to him in a laundromat. *Id.* The defendant engaged the victim in "child-like" conversation, asked him about his family, and if he had a "grandma." *Id.* When the defendant asked the victim if he wanted to perform a sex act in the bathroom, the victim declined at first, but then complied when he was asked by the defendant to come "anyway." *Id.* The *Maloney* court drew the following conclusion from the evidence: "we believe that the whole scenario of the contact between defendant and [the victim] clearly reveals that defendant sought to take advantage of [the victim's] reduced mental abilities after becoming aware of them during his conversation with him." *Id.*

¶ 59    Turning to the evidence presented here, M.D. testified that, prior to the winter of 1999 when defendant committed his sexual act, she would see defendant "quite a lot," he would stay the night "a lot," and she considered him "family." Defendant knew M.D. her whole life.

¶ 60    M.D. further testified that, in the winter of 1999, when M.D. was seven years old, she moved into a new house and wanted to show defendant her new bedroom and "Barbie" sheets. While in her room, defendant removed M.D.'s pants and penetrated her vagina with his penis repeatedly. On cross-examination, M.D. testified that she was crying while defendant penetrated her. When defendant was done, he ejaculated on M.D.'s sheets. M.D. felt something wet and asked defendant what it was. Defendant answered, "it was for [her]."

¶ 61    Our review of the evidence demonstrates that defendant's conviction under section 12-13(a)(2) was supported by more than his knowledge of M.D.'s young age. The court in *Maloney* found that the defendant, a stranger to his victim, acquired the knowledge necessary to support his conviction under the statute in effect at the time (Ill. Rev. Stat. 1987, ch. 38, ¶ 12-13(a)(2)) during a 20-minute conversation with a 15-year-old victim who had a mental age of 7. See *Maloney*, 201 Ill. App. 3d at 610-11. Defendant here was M.D.'s cousin, spent the night at her house, saw her every week, and was charged with the responsibility of watching over M.D. while her mother was away or at work. Defendant watched M.D. grow up.

¶ 62    Defendant's contact with M.D. culminated in the winter of 1999 when she was seven years old. Defendant accompanied M.D. to her bedroom, saw her "Barbie" sheets, removed her pants, and penetrated her while she cried. M.D. shared the mental age of the victim in *Maloney*, and the record contains ample support for the finding that defendant sought to take advantage of M.D.'s mental limitations, which due to her age were readily apparent, after becoming aware of them through years-long observation and interaction with her.

- 10 -

¶ 63 The circumstantial evidence in this case, viewed in the light most favorable to the State, was more than sufficient to support the reasonable inference drawn by the trial court that defendant knew M.D. was unable to understand the nature of defendant's penetrative act and unable to give knowing consent to it. See *People v. Trajano*, 2018 IL App (2d) 160322, ¶ 24 (citing *People v. Fleming*, 2013 IL App (1st) 120386, ¶ 75 (knowledge may be inferred from evidence of the defendant's acts, statements, or conduct, as well as the surrounding circumstances)); *People v. Sutherland*, 223 Ill. 2d 187, 242-43 (2006) (a conviction may be sustained on circumstantial evidence, and the trier of fact need not be satisfied beyond a reasonable doubt as to each link in the chain of circumstances when each link, taken together, satisfies the trier of fact beyond a reasonable doubt of the defendant's guilt). The State proved much more here than it did in *Lloyd*.

¶ 64 Common understanding and basic reason guide our determination that an 18-year-old defendant who, over an extended period of time has the opportunity to observe and interact with his 7-year-old cousin before he commits the sexual act proscribed by the criminal sexual assault statute (720 ILCS 5/12-13(a)(2) (West 1998)), knows that his victim is unable to understand the nature of his sexual act and unable to give knowing consent to it.

¶ 65 Defendant's remaining argument that his limited mental capacity prevented him from acquiring the knowledge necessary to commit criminal sexual assault (*id.*) is unavailing. Defendant failed to present any evidence demonstrating that his IQ of 73 or low scores in spelling, math, reading, or sentence comprehension (1) prevented him from acquiring the knowledge necessary to support his conviction or (2) defeated the clearly sufficient circumstantial evidence that supported the reasonable inference that he knew M.D. was unable to understand the nature of his sexual act and unable to knowingly consent to it.

¶ 66 The issue of defendant's limited mental capacity was extensively litigated in this case, and we defer to the trial court's well-informed determination that defendant's mental capacity did not raise reasonable doubt of his guilt.

¶ 67 Accordingly, the evidence was not so unreasonable, improbable, or unsatisfactory as to warrant a reversal of defendant's conviction for criminal sexual assault (*id.*). See *People v. Hardman*, 2017 IL 121453, ¶ 37. Defendant confessed to having put his penis inside of M.D.'s vagina, and M.D. testified positively and credibly to the same. As we already indicated, M.D.'s testimony demonstrated that when defendant committed his sexual act of penetration, he knew that M.D. was unable to understand the nature of the act and unable to give knowing consent to it. 720 ILCS 5/12-13(a)(2) (West 1998).

¶ 68 II. Plain Error Review

¶ 69 Defendant argues that the trial court erred when it allowed M.D.'s mother to testify that M.D. told her that she had been raped by defendant. Having not preserved this issue in the trial court, defendant seeks plain error review. See *People v. Cuadrado*, 214 Ill. 2d 79, 89 (2005) (an issue not raised in a posttrial motion is forfeited on appeal). We review the issue for plain error. See *People v. Sebby*, 2017 IL 119445, ¶ 48 (under plain error doctrine, a reviewing court may exercise discretion and excuse a defendant's procedural default in order to review unpreserved error).

¶ 70 On first-prong plain error review, we will only reverse defendant's conviction if a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against him, regardless of the seriousness of the error. *People v.*

*Anaya*, 2017 IL App (1st) 150074, ¶ 94. Our review begins with a determination of whether a clear and obvious error occurred. *Sebby*, 2017 IL 119445, ¶ 49.

¶ 71                                    A. Excited Utterance Exception

¶ 72        The State argues that M.D.'s mother was free to repeat M.D.'s statements at trial because they were excited utterances. See *People v. Perkins*, 2018 IL App (1st) 133981, ¶ 68 (an excited utterance or spontaneous declaration is a recognized exception to the hearsay rule); Ill. R. Evid. 803(2) (eff. Apr. 26, 2012). M.D.'s mother's testimony forms the crux of the issue:

"MS. FORELICH [(ASSISTANT STATE'S ATTORNEY)]: Now, when you got, when you had this argument right before you had to leave for work, what did [M.D.] blurt out?

A. That I was not the only one raped, she was raped also.

MR. ACOSTA [(DEFENSE ATTORNEY)]: Judge, I'm going to object to blurt out.

THE COURT: Overruled. The foundation has been laid. I believe there's sufficient basis for the State to use the outcry. Overruled. Go ahead.

* * *

Q. When you confronted [M.D.], what if anything did you learn?

MR ACOSTA: Judge, I'm going to object, there's been no 115-10 motion.

THE COURT: I'm sorry?

MR. ACOSTA: There's been no 115-10 motion. It's hearsay.

THE COURT: No, this was the outcry based on this charge and based on the evidence and the foundation laid. I'm not sure that we—There's been no 115-10. Correct; but this is still an outcry. I believe it's relevant and it's permissible. Go ahead.

Q. What did you learn, [M.D.'s mother]?

A. That she had been molested.

Q. Did she tell you who the person was that molested her?

A. Yes, she did.

Q. And whom did she tell you had molested her?

A. Her cousin [defendant]?

MR. ACOSTA: Objection again.

THE COURT: Overruled, same basis."

¶ 73        We hold that M.D.'s statements were not excited utterances. In order for a hearsay statement to be admissible under the excited utterance exception, "(1) there must be an occurrence sufficiently startling to produce a spontaneous and unreflecting statement; (2) there must be an absence of time for the declarant to fabricate the statement; and (3) the statement must relate to the circumstances of the occurrence." *People v. Williams*, 193 Ill. 2d 306, 352 (2000).

¶ 74        Admissibility is determined using a totality of the circumstances analysis, which includes several factors: the nature of the event, passage of time, the mental and physical condition of the declarant, and the presence or absence of self-interest. *Id.* While the period of time that may pass without affecting the admissibility of a statement varies greatly, a statement made when

the excitement of the occurrence no longer predominates is inadmissible hearsay. See *People v. Sutton*, 233 Ill. 2d 89, 107-08 (2009).

¶ 75    The State claims that the sexual abuse M.D. suffered as a young child triggered the statements she made to her mother more than 10 years later. But, while the nature of the sexual abuse was sufficiently traumatic, the excitement of those events no longer predominated when M.D. made her statements in 2010. See *People v. House*, 141 Ill. 2d 323, 382 (1990) (citing 6 John H. Wigmore, Evidence in Trials at Common Law § 1747, at 195 (Chadbourn rev. ed. 1976) (statements "made under the immediate and uncontrolled domination of the senses, and during the brief period when considerations of self-interest could not have been brought fully to bear by reasoned reflection" qualify for nonhearsay treatment)). Moreover, M.D.'s statements were not made in the absence of time to fabricate. *Williams*, 193 Ill. 2d at 352 (statement must be made in the absence of time to fabricate in order to qualify as excited utterance or spontaneous declaration). Accordingly, M.D.'s statements were not excited utterances.

¶ 76                         B. Corroborative Complaint Exception

¶ 77    M.D.'s statements are inadmissible under the corroborative complaint exception, which allows a witness to testify that a victim made a prompt complaint that she was raped. *People v. Sommerville*, 193 Ill. App. 3d 161, 173 (1990). Under this exception, a witness may testify only to the fact that the complaint was made. *Id.* The details of the complaint and the identity of the perpetrator are inadmissible. *People v. Gray*, 209 Ill. App. 3d 407, 417 (1991) (details of the complaint are deemed unnecessary because the purpose of the exception is to negate the presumption arising from the victim's silence). Here, M.D.'s mother testified that M.D. told her she had been raped by defendant. Thus, the corroborative complaint exception does not apply.

¶ 78                         C. Prior Consistent Statement Exception

¶ 79    We hold that the trial court erred when it allowed M.D.'s mother to testify that M.D. told her she had been raped by defendant. As a general rule, proof of a prior consistent statement made by a witness is inadmissible hearsay and may not be used to bolster a witness's testimony. *People v. Stull*, 2014 IL App (4th) 120704, ¶ 99. However, prior consistent statements are admissible to rebut a charge of recent fabrication or an inference that the witness is motivated to testify falsely. *Id.*; Ill. R. Evid. 613(c) (eff. Oct. 15, 2015).

¶ 80    Here, the testimony of M.D.'s mother was *not* elicited to rebut a charge of recent fabrication or an inference that M.D. was motivated to testify falsely. See *People v. Dupree*, 2014 IL App (1st) 111872, ¶ 42 (prior consistent statement may not be used on direct examination to enhance the credibility of a witness's testimony); Ill. R. Evid. 613(c) (eff. Oct. 15, 2015). In fact, the State elicited the testimony of M.D.'s mother on direct examination. As such, M.D.'s prior consistent statements should not have been admitted into evidence.

¶ 81    Turning to defendant's remaining argument, we find no error in the trial court's admission of the following: (1) M.D.'s testimony that she told her two high school friends what happened in the context of a secret and (2) Detective Stroud's testimony that he interviewed M.D.'s two friends during the course of his investigation. Defendant argues that "both M.D. and Stroud's testimony implied the content of the statements" and it was, therefore, inadmissible hearsay.

¶ 82     Under the investigatory procedure exception, a police officer may testify about statements made by others when such testimony is offered, not to prove the truth of the matter asserted, but instead to show the investigative steps taken by the officer leading to the defendant's arrest. *People v. Risper*, 2015 IL App (1st) 130993, ¶ 39 (citing *People v. Pulliam*, 176 Ill. 2d 261, 274 (1997)). Here, only the fact that Detective Stroud spoke with M.D.'s friends was elicited at trial. Detective Stroud did not explain why he spoke with M.D.'s friends, and he offered no details about the conversation. See *People v. Ochoa*, 2017 IL App (1st) 140204, ¶ 52 (testimony about the steps taken during an investigation cannot include the substance of a conversation with nontestifying witnesses). Neither M.D. nor Detective Stroud revealed the content of their conversations with M.D.'s high school friends and, as such, we find no error in the trial court's admission of their testimony into evidence.

¶ 83                                    D. Prejudice

¶ 84     Under the closely balanced prong of the plain error doctrine, defendant bears the burden of showing that the trial court's error was prejudicial. *Sebby*, 2017 IL 119445, ¶ 51. Defendant has not met his burden here.

¶ 85     Defendant twice confessed to the sexual conduct that supported his convictions, and the trial court found Detective Stroud's testimony regarding defendant's confession to be "very credible." Defendant stated verbally that M.D. touched defendant's penis in an up-down motion and he placed his penis in M.D.'s vagina for five minutes. In writing, defendant stated that M.D. grabbed and rubbed his penis for a couple minutes and that he put his penis inside of M.D.'s vagina. The trial court found the content of defendant's confession made M.D.'s testimony "much more credible in this Court's eyes" and that defendant's statement "corroborates the victim in many, if not all respects."

¶ 86     M.D. testified, positively and credibly, that on two separate occasions, when she was 7 years old and defendant was older than 17, defendant placed her hands on his penis and penetrated her vagina with his penis. Testifying to defendant's act of penetration, M.D. stated that defendant entered her bedroom, removed her pants, and penetrated her vagina repeatedly while she was crying. Defendant knew M.D. her whole life. Defendant acted as a babysitter and supervised her when M.D.'s mother was away or at work. The trial court noted M.D.'s difficulty when testifying to defendant's sexual acts, and the record reflects that M.D., at one point, had to leave the courtroom.

¶ 87     The issue of defendant's limited mental capacity was litigated at length and considered by the trial court in depth. The trial court found that defendant's mental limitations did not affect his ability to understand his *Miranda* rights, his fitness to stand trial, or his capacity to acquire or possess the knowledge necessary to commit the charged offenses. Accordingly, defendant has not shown that the trial court's error was prejudicial. Because defendant has failed to show prejudicial error, we need not address defendant's argument that his counsel was ineffective for failing to preserve the error for review. *People v. White*, 2011 IL 109689, ¶ 134.

¶ 88                         III. Mandatory Supervised Release

¶ 89     Defendant argues that the trial court erred when it ordered him to serve a mandatory supervised release (MSR) term of three years to life without first advising defendant of his right to be sentenced under the shorter MSR term of two years in effect when he committed his

sexual offenses. We review this pure question of law *de novo*. *People ex rel. Berlin v. Bakalis*, 2018 IL 122435, ¶ 17.

¶ 90 Section 5-8-1(d) of the Unified Code of Corrections (730 ILCS 5/5-8-1(d) (West 2014)) assigns different MSR terms to criminal offenses categorized by name and class. MSR terms are mandatory and must be written as part of the sentencing order. *Id.* ("mandatory supervised release term shall be written as part of the sentencing order"). If the MSR term assigned to a criminal offense increases after a defendant commits a criminal offense, then the defendant must be given the opportunity to choose whether to be sentenced under the law that existed at the time of offense or at the time of sentencing. *People v. Horrell*, 235 Ill. 2d 235, 242 (2009).

¶ 91 A defendant who is not given this opportunity is denied due process of law. *People v. Vlahon*, 2012 IL App (4th) 110229, ¶ 17 (citing *People v. Hollins*, 51 Ill. 2d 68, 71 (1972)). Also, the retroactive application of a law that inflicts greater punishment than did the law that was in effect when the criminal offense was committed is forbidden by the *ex post facto* clauses of the United States Constitution and Illinois Constitution. *People v. Cornelius*, 213 Ill. 2d 178, 207 (2004) (citing *Lynce v. Mathis*, 519 U.S. 433, 439-41(1997)).

¶ 92 In 1999, when defendant engaged in the sexual conduct that supported his conviction for aggravated criminal sexual abuse (720 ILCS 5/12-16(c)(1)(i) (West 1998)), the applicable MSR term was two years. See 730 ILCS 5/5-8-1(d)(2) (West 1998). In 2015, when defendant was sentenced, the MSR term was still two years. See 730 ILCS 5/5-8-1(d)(2) (West 2014). The trial court, therefore, did not err when it ordered defendant to serve a two-year MSR term because defendant's election would have been meaningless. Accordingly, a correction of defendant's mittimus is unnecessary.

¶ 93 A correction of defendant's mittimus is necessary, however, with respect to his conviction for criminal sexual assault (720 ILCS 5/12-13(a)(2) (West 1998)). When defendant committed the act that supported his conviction for criminal sexual assault (*id.*), the applicable MSR term was two years. See 730 ILCS 5/5-8-1(d)(2) (West 1998). The MSR term in effect when defendant was sentenced in 2015 was three years to life. See 730 ILCS 5/5-8-1(d)(4) (West 2014).

¶ 94 The State concedes that the trial court ordered defendant to serve an MSR term of three years to life without first advising defendant of his right to be sentenced under the shorter MSR term of two years in effect when he committed the charged offenses. Accordingly, the trial court's order ran afoul of the *ex post facto* prohibition against increasing a defendant's punishment for a previously committed offense (*Cornelius*, 213 Ill. 2d at 207), and we correct the mittimus to reflect a mandatory supervised release term of two years for defendant's conviction of criminal sexual assault (720 ILCS 5/12-13(a)(2) (West 1998); 730 ILCS 5/5-8-1(d)(2) (West 1998)). Given our findings here, any consideration of the effectiveness of defendant's counsel for failing to raise and preserve the issues related to defendant's MSR terms is unnecessary.

¶ 95                                    IV. SORA

¶ 96 Defendant challenges his obligation to register as a sex offender and asks this court to invalidate SORA on substantive and procedural due process grounds. See Ill. Const. 1970, art. I., § 2; U.S. Const., amend. XIV. He also challenges his obligation to comply with the following statutes (Separate Statutes) arguing that they are facially unconstitutional: (1) section 11-9.3 of the Criminal Code of 2012 (720 ILCS 5/11-9.3 (West 2014)), which

- 15 -

prohibits a child sex offender's physical presence on school property, proximity to places where children are found, and provision of services to and engagement in activities with children; (2) section 11-9.4-1 of the Criminal Code of 2012 (*id.* § 11-9.4-1), which prohibits child sex offenders and sexual predators from loitering on a public way, within 500 feet of a public park, and from being physically present in a public park; (3) section 5-5-3(o) of the Unified Code of Corrections (730 ILCS 5/5-5-3(o) West 2014)), which requires sex offenders to renew their driver's licenses or permits annually; and (4) section 21-101 of the Code of Civil Procedure (735 ILCS 5/21-101 (West 2014)), which prohibits sex offenders from changing their names.

¶ 97     We lack jurisdiction to consider defendant's arguments on direct appeal from his criminal convictions. Defendant's obligations to register as a sex offender and comply with the Separate Statutes were collateral consequences of his convictions. *People v. Bingham*, 2018 IL 122008, ¶¶ 10, 19; *People v. Avila-Briones*, 2015 IL App (1st) 132221, ¶¶ 91-92 (Illinois's sex offender system turns on a defendant's conviction alone). As collateral consequences, they, by definition, were neither imposed by the trial court nor embodied in its judgment. See *People v. Delvillar*, 235 Ill. 2d 507, 520 (2009) (collateral consequences are effects upon the defendant that the trial court has no authority to impose and that result from an action that may or may not be taken by an agency that the trial court does not control).

¶ 98     The scope of our review on appeal is limited to the trial court's judgment (and the proceedings and order which relate to that judgment). Ill. S. Ct. R. 615(b) (eff. Jan. 1, 1967); *People v. Lewis* 234 Ill. 2d 32, 37 (2009) ("[a] notice of appeal confers jurisdiction on an appellate court to consider only the judgments or parts of judgments specified in the notice"). Therefore, defendant's argument on direct appeal here, which challenges collateral consequences of his convictions that were neither imposed by the trial court nor embodied in its judgment, are beyond the scope of our review, and we have no power to address them. See *Bingham*, 2018 IL 122008, ¶ 18 ("a reviewing court has no power on direct appeal of a criminal conviction to order that defendant be relieved of the obligation to register as a sex offender when there is neither an obligation to register imposed by the trial court nor an order or conviction that the defendant is appealing that is directly related to the obligation or the failure to register").

¶ 99     It stands that, on direct review, the only way defendant may be relieved of his obligations to register as a sex offender and comply with the Separate Statutes is to secure a reversal of the convictions that triggered the obligations in the first place. We, however, affirm defendant's convictions here. Accordingly, defendant's arguments are dismissed.

¶ 100     We note, however, that defendant is not precluded from challenging SORA or the Separate Statutes. He may file a civil suit seeking a declaration of unconstitutionality or relief from the sex offender classification as well as the burdens of registration or directly appeal from a finding of guilt for violating SORA or the Separate Statutes. *Id.* ¶ 21.

¶ 101     Even if we had jurisdiction to consider defendant's arguments, SORA and the Separate Statutes would survive scrutiny. The commands of clear Illinois precedent preclude any decision to the contrary.

¶ 102     SORA and the Separate Statutes do not affect fundamental rights. *Avila-Briones*, 2015 IL App (1st) 132221, ¶ 74 (citing *In re J.W.*, 204 Ill. 2d 50, 67 (2003) (SORA does not affect fundamental rights)); *id.* ¶¶ 74-76 (finding that laws prohibiting a sex offender's right to change his or her name, right to drive or possess a driver's license, or to be physically present

or loiter near school property or public parks do not implicate fundamental rights); *Cornelius*, 213 Ill. 2d at 204 ("the 'right' to be free from the shame, stigma and embarrassment resulting from a conviction for sexually abusing a child is not the kind of 'fundamental right' contemplated by our constitution" (internal quotation marks omitted)). Therefore, SORA and the Separate Statutes are subject to the rational basis test. See *Cornelius*, 213 Ill. 2d at 203 (if a statute does not affect a fundamental constitutional right, the results of the rational basis test determine whether the statute comports with due process).

¶ 103      SORA and the Separate Statutes are rationally related to the legitimate state interest of protecting the public from sex offenders. *People v. Rodriguez*, 2018 IL App (1st) 151938, ¶ 25; *Avila-Briones*, 2015 IL App (1st) 132221, ¶ 84; *People v. Pepitone*, 2018 IL 122034, ¶ 31 ("there is a rational relation between protecting the public, particularly children, from sex offenders and prohibiting sex offenders who have been convicted of crimes against minors from being present in public parks across the state"). Accordingly, defendant's substantive due process challenge fails.

¶ 104      Because a defendant's convictions trigger the obligations to register under SORA and comply with the Separate Statutes, a defendant's procedurally safeguarded opportunity to contest his registration is his or her criminal trial. Any evaluation of a defendant's likelihood to reoffend or, as defendant argues, "future danger as a sex offender" is simply not relevant to the question whether he committed the qualifying offenses beyond a reasonable doubt. *Avila-Briones*, 2015 IL App (1st) 132221, ¶ 92 (a defendant has no right to a procedure that affords him the opportunity to prove a fact that is not relevant to his sex offender registration). Accordingly, defendant's procedural due process argument fails.

¶ 105                                    CONCLUSION

¶ 106      We affirm the judgment of the circuit court of Cook County and order the mittimus be corrected to reflect an MSR term of two years for defendant's conviction of criminal sexual assault (720 ILCS 5/12-13(a)(2) (West 1998)). See *People v. Mitchell*, 234 Ill. App. 3d 912, 921 (1992) (pursuant to Illinois Supreme Court Rule 615 (eff. Jan. 1, 1967), this court may correct the mittimus without remanding to the trial court).

¶ 107      Affirmed.

- 17 -