2022 IL App (1st) 191087-U

FIFTH DIVISION
February 25, 2022

No. 1-19-1087

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of Cook County. |
| | ) | |
| v. | ) | 16 CR 11542 |
| | ) | |
| FRANK ROBINSON, | ) | Honorable Thaddeus L. Wilson, |
| | ) | Judge Presiding. |
| Defendant-Appellant. | ) | |

JUSTICE CONNORS delivered the judgment of the court.
Justices Hoffman and Cunningham concurred in the judgment.

**ORDER**

*Held:* There was sufficient evidence presented to find Robinson guilty beyond a reasonable doubt of first degree murder and aggravated battery with a firearm; an evidentiary hearing must be held on the constitutionality of a mandatory life sentence as applied to Robinson. Affirmed in part; remanded for further proceedings.

¶ 1 Following a jury trial, defendant, Frank Robinson, was found guilty of two counts of first degree murder and two counts of aggravated battery with a firearm. Robinson received a mandatory natural life sentence on his two convictions for first degree murder, and consecutive sentences of 20 years in prison for each of his convictions for aggravated battery with a firearm.

For the following reasons, we affirm the convictions, but remand for an evidentiary hearing on the constitutionality of Robinson's mandatory life sentence as it applies to him under the proportionate penalties clause.

¶ 2                                I. BACKGROUND

¶ 3     Robinson and codefendant Ricky Dortch were charged with first degree murder, attempted first degree murder, and aggravated battery. The indictment alleged that on August 26, 2015, Robinson shot four people, killing two of them. A jury trial was held simultaneously with codefendant Dortch's bench trial.

¶ 4     Shukaria Hampton testified that she was dating Dortch on the date of the incident. They took his car to get breakfast and then planned to drive to Wisconsin so Dortch could attend a court hearing. Dortch received a phone call, and they made a detour to Lexington Street and Sacramento Avenue. Dortch stopped the car and Robinson got into the car with them. Hampton had known Robinson since she was a child.

¶ 5     Dortch arrived at a park and drove around it twice. Hampton saw Kwamaine Lovette at the park. Dortch said, "There they go." Dortch then parked in the alley. Robinson exited the car, raised his shirt over his nose, and approached the park. Hampton saw Robinson with a gun. Robinson moved out of Hampton's view and she heard several gunshots. When Robinson got back into the car, she saw that he had a gun in his hand. Robinson said the gun was "hot" and that it had jammed. Dortch drove down Sacramento Avenue and let Robinson out of the car. Dortch and Hampton switched cars, picked up another person that Hampton did not recognize, and drove to Wisconsin for the court hearing.

¶ 6     In May 2015, Hampton was arrested for possession of a handgun, and after this shooting incident, was arrested in Indiana on federal charges for credit card fraud. She testified that she

did not tell authorities about this shooting after her credit card fraud arrest because she was afraid. She pled guilty to the federal charges and was sentenced to two years of probation with six months of house arrest.

¶ 7     In July 2016, Hampton was stopped by Chicago police and taken in for questioning. She testified that she told the truth about what happened on the day of the shooting. She was not promised anything in exchange for information. She met with an assistant state's attorney, and then testified before a grand jury on July 6, 2016.

¶ 8     Sue Mueller, a retired assistant district attorney in Sauk County, Wisconsin, testified that in August 2015, she handled a case against Dortch. In her experience, it took about three and a half hours to get from Sauk County to Chicago. Dortch was due in court at 3:30 p.m. on the date in question, but arrived at 3:46 p.m., according to Mueller's notes.

¶ 9     Kensey Ross testified that he was incarcerated at the Illinois Department of Corrections for possession of a controlled substance. He had several prior convictions for the same offense. He was a former member of the Gangster Disciples and on the date of the incident, he was living at 317 South Albany, which he described as Gangster Disciple territory. In August 2015, Ross was on an electronic home monitoring (EHM) system as a form of pretrial release for a pending criminal charge. Ross sold drugs from his home during that time. He was not permitted to leave the house, but had discovered that the EHM equipment would not detect that he was outside his house as long as he remained on his block, so he took walks often. If he went too far, he would get a call from a central EHM box in his home, which he would have a chance to answer without violating his bond.

¶ 10     On August 26, 2015, Ross left his house and was outside the range of his EHM device. He had to run back into his house to answer the phone. He told the operator he had been taking

the trash out, but admitted he was "probably" selling drugs. At 10:30 a.m., Ross went outside to walk his dog. He noticed a dark colored BMW going up and down the street. The vehicle stopped an Albany Avenue, and Ross saw Robinson get out of the car with a t-shirt over his face. Ross testified that he had previously socialized with Robinson "dozens" of times. Robinson had dreadlocks at the time of the shooting. The car then drove into a nearby alley.

¶ 11    Ross saw Robinson point a black gun with an extended clip at the park and start shooting. Robinson went behind a church and Ross heard several more shots fired. Ross acknowledged that in his grand jury testimony, he stated that he never saw Robinson shooting the gun, but explained at trial that he must have misunderstood the question at the grand jury.

¶ 12    Robinson ran towards Ross on the way back to the car and did not have his shirt over his face at that time. Robinson got into the car, which then drove off. Ross went towards the park and saw one person lying on the ground, one person by a van who had been shot in the leg, and a crowd of people watching. When Ross realized that someone had called the police, he returned to his house. At around 4:15 p.m., Chicago police detectives showed him a photo array. He identified Robinson as the shooter.

¶ 13    Lawrence Williams testified that on the date in question, he was in Horan Park with a friend, facing the park's baseball diamond. He saw a "lot of young people standing around," and a dark colored BMW stopped in an alley nearby. Williams heard gunshots and laid down on the ground. He saw a man standing in front of the church shooting at a group of young men by the basketball court. The shooter was wearing something over his face, but Williams could see that he was Black, about 18 to 25 years old, and had dreadlocks.

¶ 14 When police arrived, Williams gave them his contact information. On August 31, 2016, Williams was interviewed by Detective Leavitt. He was given a photo array but was unable to identify anyone as the shooter.

¶ 15 Kenyon Boyd testified that he was a member of the Unknown Vice Lords gang. When called to the stand, he recanted his grand jury testimony and videotaped statement, saying that he lied in those to secure a dismissal for a pending charge of unlawful possession of a handgun and illicit substance.

¶ 16 Boyd's testimony at the grand jury was admitted into evidence as impeachment evidence. At the grand jury, Boyd testified that on the date in question, a car with Robinson, Hampton, and Dortch stopped in front of him and a group of people while they were outside on their block. Boyd recognized Robinson because he saw him nearly every day. Robinson exited the car and went into a nearby "trap house," which he explained was a house where guns and drugs are either held or sold. When Robinson came back out, he had a gun with a clip under his shirt and he entered Dortch's vehicle. After about 30 minutes the vehicle returned, and Robinson told Boyd to "check his timeline" because he "just scored." Robinson then went back into the trap house and reemerged without a gun. Boyd later learned that Lovette had died that day.

¶ 17 On September 28, 2015, Boyd told this information to detectives Leavitt and Lipsey. On December 9, 2015, he identified Robinson in a photo array.

¶ 18 On cross-examination at trial, Boyd claimed that the first time he spoke about this case was when he was arrested for illegal possession of a gun and a controlled substance. The police asked him about the shooting at Horan Park, and because he did not want to go to prison, Boyd told the detectives "what they wanted [him] to say." Boyd testified that one of the detectives told him he would avoid prison time for his charges. He stated that he gave short answers to the

5

detectives and that he just agreed with what they guided him into saying. He testified that he never met Robinson before and that he fabricated his story based on the context of the police officers' questions.

¶ 19    Assistant State's Attorney Nyshana Sumner testified that in January 2016, she argued against Boyd's motion to suppress evidence, but that it was granted. She then dismissed the case. Sumner did not coordinate with a judge or defense counsel to purposefully lose a motion in order to provide cover to dismiss a case in exchange for promised testimony.

¶ 20    Officer Elizabeth Vera, an evidence technician with the Chicago Police Department testified that on August 26, 2015, on the 3000 block of West Van Buren Street, she and her partner found 17 fired .40-caliber cartridge casings near a playground area, blood stains, and an unfired bullet. Each bullet cartridge was fired from the same gun.

¶ 21    The parties stipulated that on August 27, 2015, Dr. Adrienne Segovia, an expert in forensic pathology working for the Cook County Medical Examiner's Office, conducted the postmortem examinations of Kortney Blakes and Kwamaine Lovette. Segovia determined that both victims had died of homicide from being shot.

¶ 22    Chicago Police Detective Mark Leavitt testified that on August 26, 2015, at around 10:30 a.m., he was assigned to investigate a homicide that occurred in Horan Park. After speaking to Williams, he learned that the shooter fired a gun from a corner of the park, then ran towards a waiting vehicle. Detective Leavitt also spoke to Ross. Robinson was identified as a primary suspect. On September 20, 2015, Detective Leavitt learned that Boyd may have known about the shooting. He drove to Statesville Penitentiary with Detective Mike Lipsey and ASA Angela Carlisle. Boyd provided details of the shooting in a statement. Detective Leavitt did not promise

Boyd any benefit for his pending cases. Boyd identified Robinson as the shooter and stated that Dortch and Hampton were the other people in the BMW.

¶ 23    On October 8, 2015, Detective Leavitt obtained a warrant for Robinson's arrest, and Robinson was arrested on June 21, 2016.

¶ 24    Detective Daniel Frausto testified that on November 1, 2014, he was working as a patrol officer when he pulled over a dark blue BMW for an expired license plate. Detective Frausto asked for identification from each person in the car, where Robinson was a passenger. As a result of the stop, Detective Frausto created a "contact card" containing some information about the subject, such as the name, height, race, and date of birth. Robinson's contact card did not have anything stating that he had a face tattoo, but Detective Frausto testified that there was not "a box for that."

¶ 25    The parties stipulated that if called to testify, David Ernst, a paramedic with the Chicago Fire Department, would state that on August 26, 2015, he was dispatched to the 3000 block of Van Buren Street to treat Trevelle Washington for a bullet wound to his right calf and Shaquille Rogers for a graze wound to his left shoulder.

¶ 26    The State rested.

¶ 27    Defense counsel called Erin Hanson, the supervisor for investigations for the Chicago Office of Emergency Management and Communications (OEMC) to testify. Hansen testified that her event inquiries from the morning of August 26, 2015, showed that OEMC received a call claiming that a person had been shot near a gas station by a man with dreadlocks riding a bicycle. None of the subsequent calls described a BMW.

¶ 28    Hansen testified that there were two calls that came in about six seconds apart at 11 a.m. The phone calls came from police officers and none of the calls described a BMW.

7

¶ 29    Colibri Jackson, Robinson's older sister, testified that on the morning of August 26, 2015, she went to 2918 West Flournoy Street in Chicago. She saw her grandmother, her father, and Robinson. After she arrived, Robinson's friend Mario came to the house so that he and Robinson could bleach a pair of jeans. Jackson testified that she stayed there until 11 a.m., at which point she went to a hair appointment. Robinson never left the apartment while she was there.

¶ 30    Leonta Green, Ross's nephew, testified that in August 2015, when he visited his aunt on South Albany Avenue, he would see Ross, who was on home monitoring. Green was aware that Ross was using and selling drugs while on home monitoring. Green also knew Robinson and testified that he never saw Robinson and Ross together. He rarely socialized with either of them.

¶ 31    The jury found Robinson guilty of two counts of first degree murder and two counts of aggravated battery. They jury also found that Robinson personally discharged a firearm and personally discharged the weapon that killed the victims.

¶ 32    Robinson's posttrial motion for a new trial was denied. Prior to sentencing, he filed a motion to declare the Illinois mandatory life sentence statute violative of the United States and Illinois constitutions. Defense counsel noted that Robinson had been convicted of two homicides and that at the time of the incident Robinson was 18 years and 4 months old. Conceding that the court was required to sentence Robinson to natural life in prison, defense counsel argued that a natural life sentence for Robinson violated the eighth amendment of the United States Constitution and the proportionate penalties clause of the Illinois Constitution.

¶ 33    Robinson filed a memorandum in support of his motion for the unconstitutionality of the sentencing statute as it applied to him, contending that the court would be imposing a life sentence without parole without properly considering his youth and its attendant circumstances.

Robinson conceded that this principle "generally only applies to juveniles and that he was 18 years old at the time of his offense," but argued that courts have "recognized that the cognitive abilities of 18 to 24 -year-olds are more similar to those of juveniles than to adults and have accordingly ordered new sentencing hearings in a number of cases." Robinson asked the court to apply the same reasoning to his case and "order a new sentencing hearing requiring the trial court to consider his youth in mitigation." Robinson attached to his motion an article entitled, "Less Guilty by Reason of Adolescence," which concluded that adolescent offenders should be punished more leniently than their adult counterparts. Robinson asked the court to find a life sentence to be unconstitutional as applied to him.

¶ 34    Defense counsel later amended the presentence report to include letters from Robinson's family members and friends. Robinson's half-brother, James Banks, wrote a letter to the court saying that his father was often completely absent from his life. He knew that Robinson's upbringing was likely similar because they shared the same father, and were "robbed of having a stable home environment."

¶ 35    James Robinson, Robinson's father, wrote that Robinson's troubles were due in part to his "failures as a father." He stated that Robinson was very intelligent, but was influenced "by the same elements that negatively impact inner city communities." He asked the court to consider Robinson's young age and give him an opportunity to rehabilitate.

¶ 36    Lilliam Jackson, Robinson's mother, wrote that her son was helpful to both older and younger generations in their neighborhood. He was very involved in the church's basketball summer league and mentored young people in the community.

¶ 37    There were several letters from other members of his family and his community, all attesting to Robinson's thoughtfulness and positivity. Alexis Jackson, Robinson's cousin, wrote

that his parents faced drug addiction, and that he had a lack of social and economic resources. She also stated that as a young adult, Robinson's brain had not fully matured, and he was unable to have a full understanding of what was going on.

¶ 38    Andriela Patterson, Robinson's childhood friend, wrote that Robinson deserved another chance because his parents were absent during his childhood, and it was not easy to grow up in their neighborhood.

¶ 39    Robinson's presentencing investigation (PSI) report contained information indicating that Robinson said he had a good childhood, his home life was stable, and his basic needs were met. Robinson was a C-average student, played some sports, and dropped out of high school during his senior year. Robinson was diagnosed with ADHD during grade school, but he was not prescribed any medication. He had one child, who was three years old. Robinson frequently smoked marijuana and had taken ecstasy several times a week from when he was 14 to 16 years old, and at least once a day from when he was 16 years old until he was incarcerated.

¶ 40    At the sentencing hearing, the trial court noted that,

"there might be a situation, some scenario where a defendant between 18 and 24 might argue that the sentencing statute's unconstitutional as applied to him. But it turns on these specific facts and circumstances of that case and specific facts and circumstances specific and peculiar to that defendant. I haven't heard anything along those lines for your as-applied challenge."

¶ 41    Defense counsel responded that the PSI indicated that Robinson was a high school dropout, was diagnosed with ADHD in grade school but was never prescribed medication, saw a psychiatrist at age 11, and had many years of drug abuse (marijuana and ecstasy). Defense

counsel noted that there was a letter from his brother indicating that his mom and dad were addicts and not around during his upbringing.

¶ 42    The trial court asked, "Any medical records regarding this defendant and his brain and his brain development and juvenile maturity?" Defense counsel responded, "Not that I have in my possession." The trial court stated, "So then why would his situation be more compelling than what was presented in *Harris*?"

¶ 43    The State argued that Robinson had not put forth enough evidence from the PSI and the article to support an as-applied challenge. The trial court stated:

> "But aren't we going to really, you know, maybe 5, 10, 15 years down the road
> get to age 25 as the number? Isn't there – Haven't we heard that there's research
> about people's brains, especially boys, that it's age 25. That's why they won't let
> you rent a car till 25. And the science – even though it hasn't been presented here
> – you know, there's talk and news stories about brain being fully developed at
> age 25."

¶ 44    The State responded, "I can't tell the Court what the research will show or what other research in other cases has shown or if it's applicable to this defendant, and I don't think that would be fair to ask me to do that."

¶ 45    Defense counsel then stated that he had also attached to his motion a law review article that cited numerous studies about young men and their brains, which provided the court with reviews of the science that exists. He then said, "We would ask that the Court grant the motion or alternatively give me leave to amend it with some records that would apply to [Robinson's] situation specifically."

¶ 46    The court responded:

"Obviously one article of someone we know not of their acumen and quality isn't going to be sufficient for this type of ruling. As I said previously, this type of thing is generally – I don't know if 'known' is the right word – but at least generally banting about and heard regarding age 25, but I don't know if this would be sufficient in general or as applied to be enough."

¶ 47    In making its ruling, the trial court stated that the United States Supreme Court has maintained that the line between juvenile and adult is age 18, and that the Illinois Supreme Court has found a mandatory life sentence does not violate the eighth amendment as applied to young adults between 18 and 24 years of age. It noted, however, that *Harris*

"left open the possibility that a natural life or *de facto* natural life sentence could violate the Illinois proportionate penalties clause as applied to a young adult; however, the Supreme Court indicated that such a claim would have to show how the evolving science on juvenile maturity and brain development that helped form the basis for the *Miller* decision applies to the defendant's specific facts and circumstances. Thus, as applied, the proportionate penalties claim must be individualized to this particular defendant. A claim merely premised on age that would be categorical to all young adult defendants would be insufficient. I do not believe the defendant has presented sufficient evidence at this time with respect to an unconstitutional as-applied analysis. It may be right for a later postconviction petition but not with respect to what's before me now."

¶ 48    The trial court continued:

"Furthermore, it would likely be – or could be much ado about nothing in the sense that we have two dead bodies and we have two people who were injured.

Even if we were to consider a lesser sentence, if I had that ability, or if I had found it unconstitutional as applied to [Robinson] the resulting sentence would still likely be one that would end up for the rest of his life and he'd be looking at 40 to 50 years on each of the murders and 18 to 25 – 18 to 30 years on each of the aggravated battery with a firearm counts. And as difficult as it is for harsh sentences for juveniles and young adults, it's not so much when there are multiple victims as in this case, especially given the senseless nature and unnecessary purpose behind what took place here."

¶ 49     The trial court denied Robinson's motion. It sentenced Robinson to life in prison for each first degree murder conviction, and consecutive 20-year sentences for the aggravated battery with a firearm convictions.

¶ 50     Robinson filed a motion to reconsider his sentence, arguing that the sentence was excessive and not in keeping with Robinson's "past history or criminality, mental history, family history, family situation, economic status, occupational or personal habits." The trial court denied Robinson's motion to reconsider, and this appeal followed.

¶ 51                                   II. ANALYSIS

¶ 52     As an initial matter, we note that the State Appellate Defender filed an opening appellate brief on behalf of Robinson on November 25, 2020. On May 4, 2021, Robinson filed a motion to substitute the State Appellate Defender with a newly retained private attorney, which was granted. On May 6, 2021, Robinson's new counsel filed a motion for leave supplement his appellate brief with additional issues. On May 13, 2021, this court denied the motion "without prejudice to filing a substitute brief incorporating all the desired arguments." The State filed its response to Robinson's initial brief on June 1, 2021. Robinson filed his substitute brief on

August 2, 2021. The State responded on September 17, 2021, and Robinson replied on October 4, 2021. We address the issues contained in the substitute briefs below.

¶ 53     On appeal, Robinson argues that (1) the State failed to prove him guilty beyond a reasonable doubt where there was no physical evidence linking him to the shooting, (2) his life sentence for first degree murder was unconstitutional as applied to him, and (3) trial counsel was ineffective for not fully developing the record and requesting an evidentiary hearing for Robinson's claim that a mandatory life sentence was unconstitutional as applied to him.

¶ 54                               A. Guilt Beyond a Reasonable Doubt

¶ 55     Robinson first contends that the State failed to prove him guilty beyond a reasonable doubt of first degree murder and aggravated battery with a firearm. Specifically, Robinson argues that the convictions were not supported by credible testimony where the witnesses were inconsistent, self-interested, unreliable, and incredible. The State responds that Robinson's argument amounts to a request for us to reject the jury's findings of fact and reweigh the evidence in Robinson's favor. We agree with the State.

¶ 56     Where a defendant alleges that the State's evidence was insufficient to sustain a conviction, the reviewing court must ask "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) *Jackson v. Virginia*, 443 U.S. 307, 318 (1979); *People v. Cunningham*, 212 Ill. 2d 274, 278 (2004). This standard applies in all criminal cases, regardless of the nature of the evidence. *People v. Pollock*, 202 Ill. 2d 189, 217 (2002).

¶ 57     To prove a defendant guilty of first degree murder, the State must prove the defendant killed another individual without lawful justification, and that he intended to kill or do great

bodily harm to that individual, or that he took an action that he knew created a strong probability of death or great bodily harm. 720 ILCS 5/9-1(a)(1-2) (West 2020). To prove a defendant guilty of aggravated battery with a firearm, the State must prove that he committed a battery and knowingly discharged a firearm which caused injury to another person. 720 ILCS 5/12-3.05(e)(1) (West 2020).

¶ 58    Where a finding of guilt depends on eyewitness testimony, a reviewing court must decide whether, in light of the record, a fact finder could reasonably accept the testimony as true beyond a reasonable doubt. *Cunningham*, 212 Ill. 2d at 279. In conducting this inquiry, the reviewing court must not retry the defendant. *Id*. The reviewing court must carefully examine the record evidence while bearing in mind that it was the fact finder who saw and heard the witnesses. *Id*. at 280.

¶ 59    Here, Hampton testified that she was in the car with Dortch when they picked up Robinson, whom she had known since she was a child. Robinson exited the car with a shirt covering half his face and shot at a group of people in a park. Ross testified that he saw Robinson, whom he had met on several occasions, exit the car with a shirt over his face and shoot at a group of men in Horan Park. Williams testified that he saw a person exit the car, with a shirt obscuring some of his face, and shoot at a group of people in the park. Williams gave a description of the shooter that matched Robinson. Boyd testified to the grand jury that he saw Robinson on the date in question, shortly after the shooting, and that Robinson stated he had "just scored." A reasonable factfinder could accept as true these eyewitness testimonies beyond a reasonable doubt.

¶ 60    Nevertheless, Robinson takes issue with certain aspects of each eyewitness's testimony. Robinson argues that Ross's testimony could not be true because he testified that the shooting

took place at around 10:30 to 10:35 a.m., which was corroborated by a 9-1-1 call that was recorded at 10:35:59 a.m., but Sergeant Gaynor testified that Ross was not out of range of the monitoring system until 10:40 a.m. Robinson contends that this discrepancy shows that Ross was motivated, as a rival gang member, to lie to police about Robinson's involvement.

¶ 61    However, Ross's testimony was that the range of his electronic home monitoring device allowed him to walk down the block before the alarm would go off. Ross testified that he was outside of his home at around 10:30 or 10:35 a.m., when he saw a car driving up and down his block before entering an alley. Ross witnessed Robinson get out of the car and shoot at a group of people. Ross went back inside his house to get his brother, and then left the block, triggering the alarm for his monitoring system, to see the damage. Ross did not return to his house until after the police arrived. Accordingly, Robinson was inside the range of the EHM while witnessing the shooting, and a factfinder could find that the EHM was not triggered until he left his block.

¶ 62    Robinson contends that the EHM records show that Ross was outside the EHM range at 7:48 a.m., which demonstrates that the EHM equipment was sensitive, and the alarm would have sounded when he exited the house. However, Ross testified at trial that he told the EHM caller that he was taking his garbage out, but that he had lied and was "probably" selling drugs. A factfinder could find that at 7:48 a.m. when the alarm went off, Robinson had left his block to sell drugs.

¶ 63    Robinson also takes issue with Ross's failure to identify Dortch as the driver of the car despite an unobstructed view of the vehicle. However, as the State points out, there was no testimony presented that Ross knew Dortch before the shooting, whereas Ross testified that he knew Robinson well. Robinson was the one that pulled out a gun and shot at a group of people. It

would be reasonable for a factfinder to find that Ross would not likely be looking at the driver during this incident, regardless of whether the view was unobstructed.

¶ 64 Robinson further contends that Ross's testimony was untrustworthy because Green testified that he had never seen Ross and Robinson together. However, that does not negate Ross's testimony that he knew Robinson. Robinson's argument that Ross lied on the stand to remove Robinson as a rival gang member and to get favorable treatment in an unrelated case is nothing more than speculation, unsupported by any evidence in the record.

¶ 65 Finally, Robinson argues that Ross contradicted his prior grand jury testimony on the stand when he stated that he saw Robinson with a gun. He explained at trial that he must have misunderstood the question at the grand jury. In this case, the jury was tasked with resolving these inconsistencies and judging Ross's credibility. See *People v. Hogan*, 388 Ill. App. 3d 885, 895 (2009) (it is the function of the jury as the trier of fact to resolve conflicts or inconsistencies in the evidence).

¶ 66 Robinson also contends that Boyd's grand jury testimony was unreliable because he disavowed it at trial. During his grand jury testimony, Boyd stated that he saw Robinson exit a car, enter a trap house, pick up a gun, drive away, return to the trap house, and brag about shooting several people. At trial, Boyd recanted his grand jury testimony and said that he had lied to secure a dismissal for a pending charge of unlawful possession of a handgun and an illicit substance.

¶ 67 We find *People v. Morrow*, 303 Ill. App. 3d 671 (1999), instructive here. In *Morrow*, the defendant was indicted for murder and armed robbery, and a witness implicated him in a pretrial statement to detectives and an ASA, and in her testimony before the grand jury. *Id*. at 673-74. At trial, the witness denied knowing the victim and being present at the murder, but did not deny

that she gave the pretrial statement and grand jury testimony. *Id*. at 674-75. The defendant was convicted and argued on appeal that his convictions were solely based on the witness's "inherently untrustworthy" testimony. *Id*.

¶ 68    On appeal, this court explained that even with "no corroborative evidence, it does not necessarily portend that, as a matter of law, a recanted prior inconsistent statement *** cannot support a conviction." *Id*. at 677. If a prior statement meets the requirements of section 115-10.1 of the Illinois Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-10.1 (West 2016)), which permits the use of a witness's prior inconsistent statement as substantive evidence when certain criteria is met, a finding of reliability and voluntariness is automatically made and it is for the jury, after hearing the declarant's inconsistent testimony, to weigh the statement and decide whether it was voluntary. *Id*. See also *People v. Craig*, 334 Ill. App. 3d 426, 440 (2002) ("additional corroboration is not required and we are not to engage in looking for corroboration"); and *People v. Davis*, 2018 IL App (1st) 152413, ¶ 48 (the fact that witnesses recanted identifications at trial and the convictions rested primarily on those witnesses' "properly admitted prior inconsistent statements without corroboration does not warrant reversal.")

¶ 69    Here, Boyd's grand jury testimony was corroborated by Hamilton and Ross, both of whom testified they saw Robinson with a gun. The jury found Boyd's grand jury testimony implicating Robinson more credible than his trial testimony denying that he witnessed the events and asserting that his prior statements were guided by a detective. This determination was well within the purview of the jury. See *Hogan*, 388 Ill. App. 3d at 895 (it is the function of the jury as the trier of fact to resolve conflicts or inconsistencies in the evidence).

¶ 70    To the extent that Robinson relies on *People v. Arcos*, 282 Ill. App. 3d 870 (1996), and *People v. Reyes*, 265 Ill. App. 3d 985 (1993), we find both cases to be inapposite. In *Arcos*, there

was only one eyewitness and the trier of fact specifically found that the witness was not credible. *Id.* at 876-77. In *Reyes*, the witness's recanted testimony was uncorroborated and the only evidence of the defendant's guilt. *Id.* at 990. Here, Boyd's grand jury testimony was corroborated by other testimony presented at trial.

¶ 71 Moreover, even if the jury believed his recantation of his grand jury testimony, the remaining evidence was sufficient to prove Robinson guilty beyond a reasonable doubt. The testimony of a single eyewitness is sufficient to support a conviction. *People v. Harris*, 2016 IL App (1st) 141744, ¶ 23. Hamilton and Ross, both of whom knew Robinson prior to the date in question, identified him as the shooter.

¶ 72 Robinson further contends that Hampton's testimony was not credible because she had a criminal history and was reluctant to go to the police. We reiterate that this evidence was presented to the jury, and the jury, as the trier of fact, was tasked with resolving any inconsistencies in the evidence and weighing Hamilton's credibility. See *Hogan*, 388 Ill. App. 3d at 895 (it is the function of the jury as the trier of fact to resolve conflicts or inconsistencies in the evidence). Hamilton's testimony was corroborated by other evidence in the record, and even if the jury were to discredit her testimony, there were two other eyewitness testimonies.

¶ 73 Similarly, Robinson contends that Williams was untrustworthy because he testified at trial that the shooter had dreadlocks, but did not mention this fact to police investigators. However, Williams did not give a description of Robinson's hair at all before trial. The description he gave to police and at the grand jury matched Robinson. The additional detail of Robinson's dreadlocks at trial did not make his prior statements untrustworthy.

¶ 74 Finally, Robinson argues Detective Frausto was untrustworthy because he made a contact card for Robinson, but did not describe Robinson's facial tattoo. However, Detective Frausto

explained at trial that there was no box for him to make note of that. The card had Robinson's race, height, name, date of birth, and home address. It also stated that Robinson had dreadlocks. The jury was presented with this evidence and resolved any discrepancies or inconsistencies therein.

¶ 75                                B. Constitutionality of Sentence

¶ 76    Robinson's second argument on appeal is that his sentence is unconstitutional under both the eighth amendment and the proportionate penalties clause. Specifically, he contends that the trial court failed to give sufficient weight to mitigating factors like age and rehabilitative potential. The State responds that Robinson fails to produce a sufficient factual basis as to why his sentence is unconstitutional as applied to him.

¶ 77    The eighth amendment of the United States Constitution, which is applicable to the states through the fourteenth amendment, prohibits government from imposing "cruel and unusual punishments" for criminal offenses. *Roper v. Simmons*, 543 U.S. 551, 560 (2005). The eighth amendment guarantees individuals the right not to be subjected to excessive sanctions. *Id*. The right flows from the "precept of justice that punishment for crime should be graduated and proportioned to [the] offense." *Weems v. United States*, 217 U.S. 349, 367 (1910). "By protecting even those convicted of heinous crimes, the Eighth Amendment reaffirms the duty of the government to respect the dignity of all persons." *Roper*, 543 U.S. at 560. The Supreme Court explained:

> "The prohibition against 'cruel and unusual punishments,' like other expansive
> language in the Constitution, must be interpreted according to its text, by
> considering history, tradition, and precedent, and with due regard for its purpose
> and function in the constitutional design. To implement this framework, we have

established the propriety and affirmed the necessity of referring to 'the evolving standards of decency that mark the progress of a maturing society' to determine which punishments are so disproportionate as to be cruel and unusual." *Id.* at 560-61.

¶ 78    When the offender is a juvenile and the offense is serious, there is a genuine risk of disproportionate punishment. *People v. Holman*, 2017 IL 120655, ¶ 33. In *Roper*, *Graham*, and *Miller*, the United States Supreme Court addressed that risk and concluded that youth matters in sentencing. *Roper* held that the eighth amendment prohibited capital sentences for juveniles who commit murder. 543 U.S. at 578-79. *Graham* held that the eighth amendment prohibited mandatory life sentences for juveniles who commit nonhomicide offenses. 560 U.S at 83. And *Miller* held that the eighth amendment prohibited mandatory life sentences for juveniles who commit murder. 567 U.S. at 489-90. Our supreme court in *Holman*, 2017 IL 120655, ¶ 43, adopted the *Miller* factors.

¶ 79    However, these protections afforded by the eighth amendment apply directly only to juveniles. As our supreme court has noted, the United States Supreme Court "has clearly and consistently drawn the line between juveniles and adults for the purpose of sentencing at the age of 18." *People v. Harris*, 2018 IL 121932, ¶ 58. It stated that "claims for extending *Miller* to offenders 18 years of age or older have been repeatedly rejected." *Id.* ¶ 61. Because Robinson was 18 years old at the time of his crime, his eighth amendment challenge necessarily fails.[1]

___

[1] While our supreme court in *Harris* stated, "to the extent that defendant may have intended to raise an as-applied challenge under the eighth amendment, that claim would fail for the same reason as his challenge under the Illinois Constitution failed, because no evidentiary hearing was held and no findings of fact were entered on how *Miller* applies to him as a young adult," (*Id.*¶ 53), we can find no other cases where an as-applied challenge under the eighth amendment succeeded for a young adult aged 18 or older.

¶ 80    Turning to Robinson's as-applied challenge under the proportionate penalties clause, we note that the proportionate penalties clause of the Illinois Constitution provides that "[a]ll penalties shall be determined according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. Our supreme court has explained that this unique emphasis on rehabilitative potential provides "a limitation on penalties beyond those afforded by the eighth amendment." *People v. Clemons*, 2012 IL 107821, ¶¶ 39-41. It has specifically acknowledged that young adult offenders are "not necessarily foreclosed" from raising as-applied challenges under the proportionate penalties clause to life sentences based on the evolving science on juvenile maturity and brain development. *Harris*, 2018 IL 121932, ¶¶ 46, 48 (citing *People v. Thompson*, 2015 IL 118151).

¶ 81    In *People v. House*, 2021 IL 125124, the 19-year-old petitioner raised and an as-applied challenge to his life sentence under the proportionate penalties clause in a postconviction petition. Our supreme court found that because there was not an evidentiary hearing on that issue in the trial court, the petitioner did not provide or cite to any evidence relating to how the evolving science on juvenile maturity and brain development applied to his specific facts and circumstances, and the trial court made no factual findings critical to determining whether the science concerning juvenile maturity and brain development applied to petitioner specifically. While the appellate court cited articles from a newspaper and an advocacy group in support of its decision to find the petitioner's sentence unconstitutional, our supreme court noted that "no trial court has made factual findings concerning the scientific research cited in the articles, the limits of that research, or the competing scientific research, let alone how that research applies to petitioner's characteristics and circumstances." *Id.* ¶ 29. Because the court determined that the

record in that case required further development, it remanded the case for second-stage postconviction proceedings. *Id.* ¶ 32.

¶ 82    Similarly in *Harris*, 2018 IL 121932, the 18-year-old defendant claimed that his life sentence was unconstitutional as applied to him under the proportionate penalties clause. Our supreme court noted that "[a]ll as-applied constitutional challenges are, by definition, dependent on the specific facts and circumstances of the person raising the challenge," and that it is therefore paramount that the record be sufficiently developed in terms of those facts and circumstances for appellate review. *Id.* ¶ 39.  The court stated:

> "A court is not capable of making an 'as applied' determination of
> unconstitutionality when there has been no evidentiary hearing and no findings of
> fact. Without an evidentiary record, any finding that a statute is unconstitutional
> 'as applied' is premature." *Id.*

¶ 83    The *Harris* court noted that the record "includes only basic information about defendant, primarily from the presentence investigation report. An evidentiary hearing was not held, and the trial court did not make any findings on the critical facts needed to determine whether *Miller* applies to defendant as an adult." *Id.* ¶ 46. The court stated that the "critical point" is "whether the record has been developed sufficiently to address the defendant's constitutional claim." *Id.* ¶ 41. As the court in *Harris* emphasized, "a reviewing court is not capable of making an as-applied finding of unconstitutionality in the 'factual vacuum' created by the absence of an evidentiary hearing and findings of fact by the trial court." *Id.* (quoting *People v. Minnis*, 2016 IL 119563, ¶ 19).

¶ 84    The *Harris* court ultimately declined to remand the matter for an evidentiary hearing, finding that because the defendant failed to raise his as-applied challenge in the trial court,

therefore depriving the trial court the opportunity to make any findings of fact on the defendant's specific circumstances, his challenge was premature. *Id.* ¶ 46-48. It noted that the defendant was not foreclosed from raising his as-applied challenge in another proceeding, and that the Post-Conviction Hearing Act "specifically allows for raising constitutional questions which, by their nature, depend upon facts not found in the record." *Id.* ¶ 48.

¶ 85     Here, Robinson *did* raise his as-applied challenge in his posttrial motion in the trial court. Defense counsel argued the motion during the sentencing hearing, but there was no evidentiary hearing held on the motion. While the trial court noted it had reviewed the submitted article, letters from Robinson's friends and families, and the PSI, its general comments did not amount to factual findings necessary to determine whether a mandatory life sentence was unconstitutional as applied to Robinson. The trial court made no factual findings critical to determining whether the science concerning juvenile maturity and brain development applied to petitioner specifically. *House*, 2021 IL 125124, ¶ 29. Accordingly, because Robinson raised this issue in the trial court, but no evidentiary hearing was held, we remand for an evidentiary hearing on Robinson's challenge that his mandatory life sentence is unconstitutional as applied to him. See *People v. Jones*, 2021 IL App (1st) 180996, ¶ 33 ("We find it makes no sense to deny defendant's claim now, only to see the same claim back again in a postconviction petition"). [2]

¶ 86                                III. CONCLUSION

¶ 87     For the foregoing reasons, we affirm Robinson's convictions but remand the case for an evidentiary hearing and, if necessary, a new sentencing hearing. If the sentencing statute at issue is found to be constitutional as applied to Robinson, there would be no need for a new sentencing

---

[2] Because we are remanding this case for an evidentiary hearing for the trial court to make findings of fact critical to determining whether the science concerning juvenile maturity and brain development applied to petitioner specifically, we need not address Robinson's claim of ineffective assistance of counsel for counsel's failure to request an evidentiary hearing.

hearing and his life sentence would remain. If found unconstitutional as applied to Robinson, a new sentencing hearing should be held to determine an appropriate sentence.

¶ 88    Affirmed in part and remanded for further proceedings.